UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------- X
ARMAND EVANGELISTA, Individually and on :
Behalf of All Others Similarly Situated, :
                                       :

                Plaintiff,             :
                                         :      Case No. 1:24-cv-5292
            -against-               :
                                         :      **CLASS ACTION**
LATE STAGE ASSET MANAGEMENT, LLC, :
PRIOR 2 IPO INC., CAPITAL TRUTH :
HOLDINGS LLC, PRE IPO MARKETING :
INC., JL RIVERA ENTERPRISES LTD., :      **JURY TRIAL DEMANDED**
VALEO CAPITAL CORPORATION, VERO :
ENTERPRISE HOLDINGS LLC, EARTH TO :
ENERGY, INC., AMERICAN BIOCARBON, :
LLC, GREEN LIFE FARMS, INC., RAYMOND :
J. PIRRELLO, JR., MARCELLO FOLLANO, :
JOHN NITTOLO, JOSHUA CILANO, ROBERT :
CASSINO, ANTHONY DITUCCI, JOSEPH :
RIVERA, and JEAN HALLE, :
                                         :
              Defendants.          :
                                         :
---------------------------------------- X

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF § 12(a) OF THE SECURITIES
ACT OF 1933 AND §§ 10(b), 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

        Plaintiff Armand Evangelista ("Plaintiff"), by and through his undersigned counsel, alleges

upon personal knowledge with respect to himself, and upon information and belief based upon,

*inter alia*, the investigation of counsel and review of publicly available sources as to all other

allegations herein, as follows:

<u>**SUMMARY OF THE ACTION**</u>

        1.      This is a class action brought by Plaintiff on behalf of himself and all other similarly

situated investors in Late Stage Asset Management, LLC ("Late Stage"), against (i) defendants

Late Stage, Prior 2 IPO Inc. ("Prior2IPO"), Pre IPO Marketing Inc. ("Pre IPO Marketing"), JL

Rivera Enterprises Ltd. ("JLRE"), Valeo Capital Corporation ("Valeo Capital"), Vero Enterprise Holdings LLC ("Vero Enterprise"), Capital Truth Holdings LLC ("Capital Truth"), Earth To Energy, Inc. and its affiliate American Biocarbon, LLC (together "Earth to Energy"), Green Life Farms, Inc. ("Green Life Farms"), Raymond J. Pirrello, Jr. ("Pirrello"), Marcello Follano ("Follano"), John Nittolo ("Nittolo"), Joshua Cilano ("Cilano"), Robert Cassino ("Cassino"), Anthony Ditucci ("Ditucci"), Joseph Rivera ("Rivera") (collectively, the "Scheme Defendants") for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) defendants Pirrello, Follano, Cassino, Ditucci, Rivera, Cilano, and Jean Halle ("Halle") (collectively, the "Control Defendants")  for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t; and (iii) defendants Pirrello, Follano, Nittolo, Cassino, Ditucci, Rivera, Prior2IPO, Late Stage, Pre IPO Marketing, and JLRE (collectively the "Offering Defendants") for violations of Section 12(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77l(a).

2.      Specifically, the Scheme Defendants orchestrated a common plan and scheme whereby a network of unregistered sales agents fraudulently offered and sold retail investors purportedly "no-fee" unregistered securities through various investment funds consisting of equity interests in private companies which may in the future become public ("Pre-IPO shares").

3.      The Offering Defendants repeatedly told investors that there were no up front fees or commissions for their investments in Pre-IPO shares. These were a false statements. In reality, the Scheme Defendants would charge investors up to a 150% markup on any given pre-IPO shares sold to investors and pocket the money or use the money to pay their sales agents. The Scheme Defendants intentionally misled investors so that they would invest in Pre-IPO shares.

4.      The Scheme Defendants intentionally hid from investors Pirrello's involvement in the organization, because Pirrello is a convicted fraudster who is legally prohibited from being involved with the sale of securities.

5.      The Offering Defendants told investors that they were unaffiliated with the private companies they were selling Pre-IPO shares in (the "Pre-IPO companies"). These were false statements. Pirrello was the founder, the "Public Relations Specialist," and a major shareholder of Green Life Farms. Pirello was also the "Public Relations Specialist" of Earth to Energy. Capital Truth was the single largest shareholder of both Green Life Farms—holding over 60% of its outstanding shares—and Earth to Energy.

6.      The Offering Defendants told investors that the securities they were offering qualified for exemptions from registration under SEC Regulation D. This was also false.

7.      From at least March 2019 through March 2023, the Scheme Defendants raised approximately $528 million from more than 4,000 investors located across the country, including in this District.  In exchange for their investments, investors received securities: interests in a subsection (called a "Series") of one of Late Stage's many private investment funds (the "Late Stage Funds").  Each of the Series invested in various Pre-IPO shares of the Pre-IPO Companies.  By 2022, the Scheme Defendants had defrauded investors out of and paid themselves and their affiliated sales agents approximately $88.6 million in undisclosed markups.

8.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against the Scheme Defendants for violations of Sections 10(b) of the Exchange Act and Rule 10b-5 and against the Control Defendants for violations of Section 20(a). Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act. Plaintiff also asserts claims against

the Offering Defendants for violations of Section 12(a) of the Securities Act. Plaintiff seeks rescission and/or damages for the illegal securities offerings.

## PARTIES

9.      Plaintiff Armand Evangelista is an investor in Pre-IPO shares through Late Stage.

10.     Defendant Late Stage Asset Management, LLC ("Late Stage") is a Delaware limited liability company formed in February 2015 with its principal place of business in Montclair, New Jersey.  Late Stage was the manager to the various Late Stage Funds.  Late Stage has never been registered with the SEC in any capacity.

11.     Defendant Prior 2 IPO Inc. ("Prior 2 IPO") is a New Jersey corporation incorporated in February 2017 with its principal place of business in Sparta, New Jersey. Prior2IPO solicited investors for pre-IPO investment opportunities through Late Stage Funds. It has never been registered with the SEC in any capacity.

12.     Defendant Pre IPO Marketing Inc. ("Pre IPO Marketing") is a New York corporation incorporated in July 2018 with its principal place of business in Freeport, New York. Pre IPO Marketing operated as a branch office of Prior2IPO, soliciting investors for pre-IPO investment opportunities through Late Stage Funds.  It has never been registered with the SEC in any capacity.

13.     Defendant JL Rivera Enterprises Ltd ("JLRE") is a New York corporation incorporated in April 2020 with its principal place of business in Elmont, New York.  JL Rivera Enterprises operated as a branch office of Prior2IPO, soliciting investors for pre-IPO investment opportunities through Late Stage Funds.  It has never been registered with the SEC in any capacity.

14.     Defendant Valeo Capital Corporation ("Valeo Capital") is a New Jersey corporation incorporated in June 2017 with its principal place of business in Sparta, New Jersey. It was owned and controlled by Pirrello.

15.     Defendant Vero Enterprise Holdings LLC ("Vero Enterprise") is a New Jersey limited liability company formed in December 2018 with its principal place of business in Montclair, New Jersey.  It was owned and controlled by Follano.

16.     Defendant Capital Truth Holdings LLC ("Capital Truth"), a Delaware limited liability company, was the entity which purportedly held the shares of Pre-IPO companies out of which the Late Stage Funds offered the Series investments. As of July 2023, Capital Truth was the largest shareholder in Green Life Farms, holding over 60% of its outstanding shares. Likewise, as of July 2023, Capital Truth was the largest single shareholder in Earth to Energy.

17.     Defendant Green Life Farms, Inc. ("Green Life Farms") is a privately held Florida corporation purportedly using hydroponic growing techniques to grow lettuces and other vegetables, with a principal place of business in Lake Worth, Florida. Late Stage offered investors the opportunity to purchase Green Life Farms pre-IPO stock. Green Life Farms was founded by Pirrello. Pirello held the title of Public Relations Specialist at Green Life Farms. Capital Truth was the largest shareholder of Green Life Farms holding over 60% of its outstanding shares. Pirrello was also major shareholder of Green Life Farms.

18.     Defendants Earth to Energy, Inc., a Florida corporation, and its affiliate American Biocarbon, LLC, a Louisiana limited liability company (together, "Earth to Energy"), are privately held companies purportedly producing pellets made from sugar cane waste and biochar which could be used as a soil supplement. Earth to Energy's principal place of business was in White Castle, Louisiana. Late Stage offered investors the opportunity to purchase Earth to Energy stock.

Pirello held the title of Public Relations Specialist at Earth to Energy. Capital Truth was the single largest shareholder of Earth to Energy.

19.     Individual Defendant Raymond J. Pirrello, Jr. ("Pirrello") was the founder and owner of Prior2IPO. Pirello is also an un-papered founder of Late Stage. Pirrello was found guilty of violating federal securities laws and barred from engaging in the brokerage, dealing, or selling of certain securities. Pirrello was the founder and major stockholder of Green Life Farms. Pirrello was the Public Relations Specialist at Green Life Farms and Earth to Energy.

20.     Individual Defendant Marcello Follano ("Follano") was the founder, Managing Partner, and President of Late Stage and the Late Stage Funds.  From 2006 to 2015, Follano was a registered representative associated with various broker-dealers registered with the SEC.  From at least March 2019, Follano was not licensed or registered with the SEC in any capacity.

21.     Individual Defendant John Nittolo ("Nittolo") was a fund manager at Late Stage. Nittolo signed private placement memoranda and/or side letters on behalf of Late Stage.

22.     Individual Defendant Joshua Cilano ("Cilano") was the President, Sole Authorized Person and Managing Member of Capital Truth. Cilano teamed up with Pirello and Follano from the beginning and was one of the main architects of the fraudulent scheme alleged herein.

23.     Individual Defendant Robert Cassino ("Cassino") was a co-owner of Pre IPO Marketing. From 1993 to 2008, Cassino was a registered representative associated with various broker-dealers registered with the SEC. From at least March 2019, Cassino was not licensed or registered with the SEC in any capacity.

24.     Individual Defendant Anthony Ditucci ("Ditucci") was a co-owner of Pre IPO Marketing.  From 2014 to 2016, DiTucci was a registered representative associated with various

broker-dealers registered with the SEC.  From at least March 2019, DiTucci was not licensed or registered with the SEC in any capacity.

25.    Individual Defendant Joseph Rivera ("Rivera") was the owner of JLRE. From 2000 to 2012, Rivera worked as a registered representative associated with various broker- dealers registered with the SEC.  From at least March 2019, Rivera was not licensed or registered with the SEC in any capacity.

26.    Individual Defendant Jean Halle, aka John Halle, ("Halle") is the Chairman and CEO of Green Life Farms and Earth to Energy.

27.    Defendants Pre IPO Marketing and JLRE were branch offices and affiliates of Prior2IPO, and are collectively referred to herein with Prior2IPO as "Prior2IPO."

28.    Individual Defendants Pirrello, Follano, Nittolo, Cassino, Ditucci are collectively referred to herein as the "Individual Offering Defendants."

29.    Defendants Pirrello, Follano, Nittolo, Cassino, Ditucci, Rivera, Prior2IPO, Late Stage, Pre IPO Marketing, and JLRE are collectively referred to herein as the "Offering Defendants."

30.    Defendants Pirrello, Follano, Nittolo, Cassino, Ditucci, Rivera, Cilano, Late Stage, Prior2IPO, Pre IPO Marketing, JLRE, Valeo Capital, Vero Enterprise, Capital Truth, Earth To Energy, and Green Life Farms are collectively referred to herein as the "Scheme Defendants."

31.    Individual Defendants Pirrello, Follano, Cassino, Ditucci, Rivera, Cilano, and Halle are collectively referred to herein as the "Control Defendants."

32.    Defendants Pirrello, Follano, Nittolo, Cassino, Ditucci, Rivera, Cilano, Halle, Late Stage, Prior2IPO, Pre IPO Marketing, JLRE, Valeo Capital, Vero Enterprise, Capital Truth, Earth To Energy, and Green Life Farms are collectively referred to herein as the "Defendants."

## JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Securities Act and the Exchange Act.

34.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

35.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

**I.      The Scheme Defendants Operated a Fraudulent Investment Scheme**

A.      Pirello is a Known Bad Actor with a History of Violating Federal Securities Laws

36.     From 1996 to 2016, Pirrello was a registered representative associated with various broker-dealers registered with the SEC.

37.    On July 7, 2016, the SEC filed a complaint against Pirrello and his co-conspirators alleging multiple instances of insider trading. *Securities and Exchange Commission v. Pirrello*, No. 1:16-cv-02459 (N.D. Ga. Jul 07, 2016). On August 14, 2019, a jury found Pirrello guilty of three separate violations of Section 10(b) and Rule 10b-5 and two separate violations of Section 14(e) and Rule 14e-3 all related to the insider trading ring orchestrated by Pirrello. On September 9, 2019, the court entered a final judgment enjoining him from future violations of Sections 10(b) and 14(e) of the Exchange Act, and Rules 10b-5 and 14e-3 thereunder. On September 23, 2019, the SEC barred Pirrello from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization, and from participating in any offering of a penny stock.[1]

38.    From at least March 2019, Pirrello was not licensed or registered with the SEC in any capacity. And during this time period, Pirello partnered up with Follano and Cilano to form his next fraudulent securities scheme: Late Stage and Prior2IPO.

B.    Structure of the Fraudulent Scheme

39.    The Scheme Defendants essentially operated a boiler room scheme with a network of sales offices across the country that fraudulently solicited investors to invest in Pre-IPO shares offered through Late Stage investment funds.

40.    Late Stage acquired rights to Pre-IPO shares of various private companies through its affiliate Capital Truth. Late Stage then operated as the central investment center that offered illegal, un-registered securities of Pre-IPO shares to retail investors via a series of Late Stage

---

[1] Raymond J. Pirrello, Jr., Exchange Act Release No. 87044 (Sept. 23, 2019) (the "Order").

Funds. Prior2IPO and its affiliate branch offices, Pre IPO Marketing, and JLRE (collectively, the "Prior2IPO"),[2] were the sales offices that solicited investors into investments with Late Stage.

41.    Pirello controlled the sales efforts for Late Stage through Prior2IPO. Pirrello oversaw and managed the supervising sales agents of the other sales offices affiliated with Prior2IPO, including Cassino, DiTucci, Rivera, Pre IPO Marketing, and JLRE. Pirrello directed Prior2IPO and its sales agents, to tell investors that there were no upfront fees, to never mention commissions, and to portray themselves as "marketers." Pirrello repeated these instructions during regular Zoom calls with the sales agents.

42.    Sales agents at Prior2IPO sold investments in Late Stage by cold-calling lists of accredited investors, soliciting via websites, and social media marketing. They used pitches and materials created by Pirrello and Follano to tell potential investors that investments in Late Stage had "no up front fees" and the only fees charged to investors came as carried interest of 20% of the investors' profits made upon the Pre-IPO shares going public. The pitch was designed to make investors believe that all of the money they were investing was being used to purchase Pre-IPO shares. In reality, only a portion of the invested money was used to purchase shares. The Offering Defendants were purchasing Pre-IPO shares at a fraction of the stated investment value and charging investors substantial markups on the Pre-IPO shares—in some instances, up to 150% of the share price. The Offering Defendants then took this markup as personal profit to pay the Individual Offering Defendants and their salespeople.

43.    Late Stage did not own the shares of the Pre-IPO Companies. Capital Truth purportedly held the shares of the Pre-IPO Companies and Late Stage purchased the rights to those

---

[2] In an email dated November 11, 2019, Pirrello instructed sales agents associated with other sales offices that if their emails used the name of the sales office, they should "edit the disclaimer to say you['re] from Prior2IPO."

shares from Capital Truth. Capital Truth would hold the shares until the private company went public. Once the shares were publicly traded, Capital Truth was supposed to distribute shares to Late Stage, who would in turn was supposed to distribute the shares to Late Stage investors.

44.     When Late Stage received the money from its investors, it transferred the money to Capital Truth. Upon receipt of the investor funds, Capital Truth would take the markup amount and distribute the money to the Offering Defendants and their sales agents. Capital Truth would pay Vero Enterprise for Follano and Valeo Capital for Pirrello. Sales agents would send invoices for their share of the markups to Pirrello through Valeo Capital. In turn, Pirrello caused Valeo Capital to pay the Offering Defendants and their sales agents their transaction-based commissions based on the number of Pre-IPO shares they sold to investors.

45.     Between 2019 and 2022, (i) Valeo Capital received approximately $78 million from Capital Truth, representing Pirrello's, the Individual Offering Defendants', and their sales agents' share of the undisclosed markups taken from Late Stage investors; (ii) Pirrello, directly and through Valeo Capital, received approximately $18.9 million in undisclosed markups; (iii) Vero Enterprise received approximately $10.3 million from Capital Truth, representing Follano's share of the undisclosed markups taken from Late Stage investors; (iv) Cassino and DiTucci, through Pre IPO Marketing, received approximately $9.3 million in undisclosed markups taken from Late Stage investors; and (v) Rivera, through JLRE, received approximately $3.6 million in undisclosed markups taken from Late Stage investors.

46.     Below is a chart illustrating the investment scheme:



C. <u>The Numerous Representations that Late Stage Investments Had No Up Front Fees</u>

47.     The Offering Defendants made numerous oral, electronic, and written statements to investors representing that investments in Pre-IPO shares through Late Stage came with no up front fees. This no up front fee structure was the primary selling point and was featured by the Offering Defendants in investor communications, marketing materials, websites, social media posts, pitch books, scripts and written communications used by sales agents, videos posted on YouTube, LinkedIn and other social media sites, and podcasts.

48.     On sales calls with prospective investors, the Offering Defendants and their sales agents routinely pitched the Late Stage Funds' offerings of Pre-IPO shares by stating that, unlike other funds, the Late Stage Funds profited only by taking twenty percent (20%) of investors' profits

when the Pre-IPO Companies went public and did not charge any upfront fees or commissions. For example:

- On a January 28, 2021 call, Cassino falsely stated that there are "no fees on the front end, only on the backend. Twenty percent of the profit."

- On a February 28, 2022 call, when asked whether investors pay the same price that Late Stage pays, Pirrello falsely stated that "Late Stage always buys from where they buy at the price that you're paying."

- On a March 1, 2022 call, Pirrello falsely told a potential investor that "Late Stage has never" charged upfront fees in connection with its investments, and that investors are "paying the same price" the fund is paying for shares.

- On a March 2, 2022 call, Follano, falsely confirmed that Late Stage charges "no up front fees," that the price Late Stage pays for the Pre-IPO shares is the price the investor pays, and falsely explained that he used to charge upfront fees, but he "[doesn't] need to charge any upfront fees anymore," that he "always felt it's better up front for every dollar to go to work for you in the investment," and that not charging upfront fees was a way to "separat[e] [him]self from everyone else." He further stated that "the only fee that you will pay is the same fee I pay from the brokerage firms to deliver me my shares…it's like 75, 100 bucks."

- On a March 8, 2022 call, Rivera falsely told a potential investor that "we don't charge any upfront fees" and that "the only fee that they do charge is on the backend." Rivera explained that it's "kind of like a performance fee…it's based off of the profits. It's called carried interest...it's twenty percent of only the profits."

49.     Prior2IPOs market presentations stated: "Our company Prior2IPO was created with the purpose to bring our members the best opportunities in the world without the typical fee structures of the average brokers and advisors. (WE CHARGE YOU ZERO)." Similar statements emphasizing the absence of any fees were included in social media posts issued by Prior2IPO and on Prior2IPO's website.

50.     For example, Prior2IPO's website advertised themselves as "connect[ing] private accredited investors to shares of the largest industry disruptors.  Sometimes at discounts as much as 50% of the expected IPO." Stating that "Late Stage Investment Family of Funds" was Prior2IPO's "largest client" and listed the because "there are no upfront fees."

51.     Below is a screenshot from the now-deleted Prior2IPO website explicitly denying upfront fees or any other front end costs:[3]

## 4. Costs Of Your Membership Holdings

The Funds we work with DO NOT charge any upfront fees with this transaction, the only costs involved are charged on the back end of the membership holdings after there is some sort of liquidity event. At which time, there will be a 20% fee charged on any profitable portion of your membership holdings, after your initial principle is recouped. No other fees will be assessed.

52.     Identical claims were made on the Prior2IPO twitter account @JoinPrior2IPO on March 26, 2021:

---

[3] Still available at: https://web.archive.org/web/20220519152628/https://prior2ipo.com/the-process/



53.     The private placement memoranda ("PPM") and side letters entered into between investors and Late Stage to invest in the Late Stage Funds contained further false and misleading representations about fees.

54.     The PPMs for the Late Stage Series stated that during the term of each fund, "the Members will not be required to pay to the Fund any management fee" and that Late Stage or its affiliates "shall bear all the expenses of the Fund," except the PPMs for certain funds specified that the investor "shall be responsible for any DTC transfer fee that may be imposed . . . in connection with the distribution of any Marketable Securities by the Company."

55.     The PPMs continued by stating that Late Stage shall not charge investors "expense Fee ('Expense Fee') or for any of the following Company expenses ('Company Expenses'):" including, *inter alia*, marketing costs, Overhead, compensation of employees and personnel, Operational Expenses, and "[a]ll expenses incurred by the Company, including out-of-pocket expenses, related to the discovery, investigation, development, evaluation, structuring or

negotiation of investment opportunities including, without limitation, transactions that are not consummated."

56.     The side letters executed between investors and Late Stage stated that they were "a legally binding document that memorializes various terms of the [i]nvestment that are (1) not documented elsewhere; and/or (ii) may conflict with various provisions of the limited liability company operating agreement of the [f]und."

57.     Each side letter provided that it "constitutes a valid and binding obligation of the Manager, the Fund and the Purchaser, and supersedes any actual or potentially conflicting wording in the Subscription Booklet of the Fund and the Operating Agreement."

58.     The side letters also stated that "[t]here are no fees what-so-ever attached to this investment other than the [c]arried [i]nterest documented" in the side letter. The side letters outlined the "carried interest" or profit-sharing percentage the parties agreed to, with the standard fee being twenty percent of any profit the investor realizes. Certain side letters provided for a lower fee.

59.     For example, a side letter signed by Follano dated June 26, 2019 with an investor who purchased interest in a Series of Pre-IPO shares advised that "[t]here are no fees what-so-ever attached to this investment other than the Carried Interest documented… above" and that "a[]ny other fees…shall be null and void." Similar side letters signed by Follano dated August 20, 2019 and March 3, 2021 contained the same language.

60.     Notwithstanding the flood of representations to the contrary, the Scheme Defendants *always* charged substantial up-front fees on *every* investment in the form of an undisclosed markup—the difference between the price at which they acquired the Pre-IPO shares and the price at which they sold corresponding Pre-IPO shares to investors.

D.    The Scheme Defendants Intentionally Misled Investors Regarding Pirello and the Upfront Markups Charged to Pre-IPO Shares

61.    Pirrello regularly communicated with the Prior2IPO sales agents, including Cassino, DiTucci, and Rivera, through text, email, and by posting to a shared Dropbox account regarding the inventory of available Pre-IPO shares and their pricing.

62.    Pirrello placed inventory lists and pricing sheets in a shared Dropbox account and identified the fund's cost for Pre-IPO shares, the fixed price(s) shares could be sold for, the number of shares available, the Pre-IPO Company's outstanding shares, its current valuation, and its projected IPO valuation.  These pricing lists made it crystal clear to Offering Defendants and their sales agents that Prior2IPO was charging up-front markups (ranging between 3% and 150%) on the Pre-IPO shares because sales agents could see that the prices they were selling Pre-IPO shares to investors at was higher than the prices at which Late Stage Funds purchased the Pre-IPO shares—in fact, that is how they got paid.

63.    When new inventory of Pre-IPO shares became available, Pirello would text sales agents the number of shares available, the price the shares were acquired at, and the price at which the Pre-IPO shares were to be sold to Late Stage investors. For example:

- On June 20, 2020, Pirello texted Prior2IPO's sales agents, including Cassino, DiTucci, and Rivera, instructing them to sell Pre-IPO shares acquired at $45 to investors at $55.

- On June 23, 2020, Pirello texted Prior2IPO's sales agents, including Cassino, DiTucci, and Rivera, instructing them to sell Pre-IPO shares acquired at $105 to investors at $125.

- On December 23, 2020, Pirrello texted Prior2IPO's sales agents: "Green Life New Pricing $6 cost $3."

- On February 24, 2021, Pirello texted Prior2IPO's sales agents instructing them to sell Pre-IPO shares of Green Farms acquired at $10 to investors at $15.

64.     Pirrello instructed sales agents they would get paid "fifty percent of the markup that we created, and they get fifty percent of the carried interest." So, sales agents used these spread figures to keep track of their markups to invoice Pirello through Valeo Capital. Sales agents received their share of the upfront markups in cash and their share of the back-end carried interest in shares of the investors' stock.

65.     Accordingly, the Offering Defendants and their sales agents not only knew exactly how much of a markup they were charging investors on Pre-IPO shares, but were incentivized and expressly compensated based on that markup.

66.     In order to maximize sales, and collect their portion of the markup, it was important that sales agents withhold this information from potential investors. As Rivera explained to a sales agent on March 8, 2022, "as far as the clients are concerned, like, there's no upfront fees. There's nothing on the paperwork, there's no markup there or anything. So, yeah, you don't have to worry about that." And later on March 16, 2022, Rivera expressly warned that "the client never sees the markups so don't ever mention markups."

67.     Furthermore, the Offering Defendants knew that investors would not want to purchase securities from a known securities fraudster. So, despite his critical role in founding and managing the operations of Late Stage and Prior2IPO, the Offering Defendants concealed Pirello's identity and involvement from investors by leaving his name off of documents, changing his referred name to "Raymond John," "Ray John," or Ray (a common technique used by fraudsters to evade internet search results), and refusing to provide further information about Pirrello to investors.

68.     In fact, the Offering Defendants, including Pirello himself, admit this.

69.     Pirrello's signature block on his Prior2IPO email account identified him as "Raymond John" and as the founder of Prior2IPO. And a version of the Prior2IPO pitch deck circulated to sales agents for soliciting investors identified Pirrello as "Our Founder Raymond John," alongside his picture. However, Pirrello was not mentioned on calls with investors and appears nowhere in the PPMs, side letters, Prior2IPO website, or Prior2IPO social media.

70.     On a January 28, 2021 call with sales agents, Cassino was asked for Pirrello's last name to look up Pirrello, and Cassino replied, "[T]hat's a bad idea…he had some regulatory issues."

71.     Similarly, during a February 12, 2021 meeting, a potential sales agent asked Cassino and DiTucci how Pirello became the boss: "that guy Roy, Ray…I looked at him, I googled him and I'm like how…is this guy the boss? He looks like a…mess…I gotta worry about this guy paying me...I was a little nervous." Cassino assured the potential sales agent that he would get paid and DiTucci told him not to worry because "you're never going to hear the name Raymond ever."

72.     And in a meeting with a sales agent on October 21, 2021, Pirello explained why he concealed his identity: "I got in trouble back in '16 for trades that were done in '11 . . . it was an insider trading thing" and that the case "ended up going civil and I lost the civil trial. . . . [F]or me, I said you have to separate church from state and mostly it was to isolate me from the whole game, right? I figured if I was involved, and I lost my case, that it would, it would, you know, wreck the whole thing anyway, so I wanted to keep my name out of it. So, I said let's start a marketing company."

73.     In sum, the Scheme Defendants not only knew that they were making false and misleading statements to investors concerning fees, markups, and affiliation with known

fraudsters, but were financially incentivized to carry out the fraudulent scheme designed by Pirrello, Follano, and Cilano.

E.    <u>Investors Never Received Instacart Shares</u>

74.    In addition to pocketing the undisclosed markup fees, Late Stage further harmed its investors by not delivering the shares of Instacart—purchased as Pre-IPO shares—after its initial public offering.

75.    The Offering Defendants sold Pre-IPO shares of Instacart to investors at highly inflated prices, at least $125.

76.    Instacart shares went public through an IPO on September 19, 2023 at a price of $30 per share.

77.    Once the shares went public, Late Stage was supposed to transfer the public shares to its investors. However, Late Stage investors never received their shares of Instacart after the IPO.

F.    <u>Green Life Farms and Earth to Energy Investments</u>

78.    The Scheme Defendants employed a common fraud technique of falsely implying credibility through the use of well-recognized name brands. The logos and trademarks of these name brands were included all over the Offering Defendants' websites and social media accounts.

79.    In the PPMs, Late Stage stated "Affiliates of the Manager have been involved in investments in such companies as Facebook, Chegg, Lyft, LinkedIn, AirBnB, Palantir, Bloom Energy, ZocDoc, Addepar, Box, Cloudera, Flurry, DropBox, Zscaler, MongoDB, Square and Twitter, among others."

80.    When Late Stage first approached potential investors, they would use well-known private companies to lend an air of legitimacy to their scheme. For example, when reaching out to

Plaintiff, Prior2IPO first sold them on shares of Marqueta and Instacart. These were two well-known companies that, through a simple internet search, an investor could see potential rumors of upcoming public offerings.

81.    But once the Offering Defendants got the investor on the hook, they would push and continue to sell them on obscure companies affiliated with the scheme—Green Life Farms and Earth to Energy. These companies are significantly lesser known entities operated by Individual Defendant Halle with little to no publicly available information. Investors were forced to rely upon Prior2IPO's representations that Green Life Farms IPO was planned for the first or second quarter of 2023.

82.    The Offering Defendants had control over the price of these Pre-IPO shares, and could charge investors much greater markups. As illustrated by Pirello's texts, the Offering Defendants were charging massive markups—at times 100% markups—on shares of Green Life Farms.

83.    Moreover, and inexplicably, the price of Green Life Farms stock skyrocketed during the period of heavy sales by the Offering Defendants of Green Life Farms Pre-IPO shares. Over the course of two months, from December 2020 to February 2021, the underlying price per share of Green Life Farms rose for $3 per share to $10 per share and the Pre-IPO Share price rose from $6 per share to $15 per share.

84.    However, after examining the undisclosed affiliation of these companies to the Defendants, explanation materializes.

85.    Green Life Farms was founded by Pirrello. Pirello held the title of Public Relations Specialist at Green Life Farms. Capital Truth was the largest shareholder of Green Life Farms

holding over 60% of its outstanding shares. Pirrello was also major shareholder of Green Life Farms.

86.    Similarly, Capital Truth was the single largest shareholder of Earth to Energy. And Pirello also held the title of Public Relations Specialist at Earth to Energy.

87.    None of this information was disclosed to Late Stage investors. To the contrary, investors were told that Late Stage was not related to these companies and had no further information about the companies:

- "The Fund is not related to Green Life Farms or any of its affiliates."

- "The Fund has no further information about Green Life Farms."

- "The Fund is not related to Earth to Energy, Inc. - Grow Power or any of its affiliates."

- "The Fund has no further information about Earth to Energy, Inc. - Grow Power."

88.    In sum, a critical part of the Scheme Defendants' fraud was for to sell Late Stage investors shares of affiliated companies at wildly inflated prices, and conceal both the company affiliation and the markups from investors. Prior2IPO falsely told shareholders that an IPO would be imminent. However, these companies remain private to this day and Late Stage investors have received zero return on their investments from either Earth to Energy or Green Life Farms.

G.    Government Investigations

89.    On December 5, 2023, Pirello was indicted on counts of securities fraud conspiracy, wire fraud conspiracy and securities fraud relating to a scheme to defraud investors and prospective investors in securities offered by Late Stage Management, LLC through several sales offices, including Prior2IPO, which he controlled.

90.    On December 7, 2023, the SEC announced charges against Raymond J. Pirrello, Jr., Marcello Follano, Robert Cassino, Anthony DiTucci, Joseph Rivera, and their New Jersey or

New York-based companies Prior 2 IPO Inc., Late Stage Asset Management, LLC, Pre IPO Marketing Inc., and JL Rivera Enterprises Ltd. for making fraudulent offerings relating to investments in pre-initial public offering (IPO) companies.

## II.   False and Misleading Statements

91.   The Offering Defendants made the following false and misleading statements to Plaintiff and the Class:

   i.   Statements concerning no up front fees in Late Stage and statements that Late Stage pays the same price for securities as investors;

   ii.   Statements concerning the relationship(s) between Late Stage and Green Life Farms and Earth to Energy and omissions concerning Pirrello's involvement and history of fraudulent behavior; and

   iii.   Statements that investments in Late Stage funds qualified under the safe harbor exemption provided by Rule 506(c) of Regulation D and that Late Stage was conducting the Offering pursuant to Rule 506(c) and omissions concerning Pirrello's involvement and history of fraudulent behavior.

92.   First, as discussed in detail above, the Offering Defendants made numerous oral, electronic, and written statements to investors representing that investments in Pre-IPO shares through Late Stage came with *no up front fees*. These statements were false and misleading because the Scheme Defendants always charged substantial up-front fees on every investment in the form of an undisclosed markup. The no up front fee structure was the primary selling point for the Offering Defendants to sell investors on Late Stage. Moreover, by charging fees in the form of a markup on the Pre-IPO Share price, it greatly affects how much return investors would receive when (or if) the pre-IPO company ever went public. Indeed, for two of the Late Stage Pre-IPO

Companies, Marqueta and Instacart, that ended up going public, Late Stage investors lost large amounts money on their investments. It is indisputable that investors would find information about the price and value of the Pre-IPO shares important in making an investment decision. This same reasoning applies to statements that Late Stage was paying the same amount for Pre-IPO shares as Late Stage investors.

93.     Second, as discussed in detail above, the PPMs make false and misleading statements concerning the relationship(s) between Late Stage on the one hand and Green Life Farms and Earth to Energy on the other. These statements are false and misleading because (i) Late Stage is affiliated with and/or related to Green Life Farms and Earth to Energy through Pirello and Capital Truth and (ii) Late Stage had further information to disclose to shareholders concerning these companies. The omission of information concerning Pirello's involvement with both Late Stage and these companies also renders these statements misleadingly incomplete. Investors would certainly want to know that they were buying shares in a private company that is closely related to both the insiders selling them the interests and an individual with a convicted history of securities fraud.

94.     Third, the PPMs make at least 18 references to the use of the safe harbor provided by Rule 506(c) of Regulation D. These statements are facially false, because, as explained in detail below, Rule 506(c) is inapplicable here due to Pirello's history of securities fraud. This renders the PPMs illegal, unregistered securities offerings. Moreover, the omission of information concerning Pirello's role with Late Stage and his history of securities fraud renders these statements misleadingly incomplete. The legality of a securities offering is certainly information investors would find important in making an investment decision.

24

95.    Plaintiff and Class relied on these statements in entering into securities agreements with the Offering Defendants. Indeed, each Late Stage investor was required to submit information sufficient to establish themselves as an accredited investor, purportedly to comply with Rule 506(c). It is unquestionable that investors entering into a securities contract rely on the legality of that securities contract.

96.    In sum, these knowingly false and/or misleading statements were material to Late Stage investors' decision to purchase these securities and as a result of their reliance on these statements, each was financially harmed, as explained below.

**III.    Loss Causation and Damages Allegations**

97.    Through their fraudulent scheme, concealment, false and misleading statements, and illegal sale of unregistered securities,  Defendants have caused Plaintiff and the Class millions of dollars in damages.

98.    Plaintiff and the Class were damaged in numerous ways, including (i) the loss in value on various Pre-IPO shares that were sold to investors at artificially inflated prices, (ii) Late Stage's failure to deliver investors' shares in companies that actually went public through IPOs, (iii) their inducement to invest in potentially worthless companies affiliated with convicted fraudsters, and (iv) the millions of dollars stolen in undisclosed markup fees.

99.    Since the entire investment theory in Pre-IPO shares was based on the appreciation of stock value from when the company was private through when the company went public, it was critical for investors to know the actual value of the Pre-IPO shares they were purchasing. By selling Pre-IPO shares at artificially inflated prices so that they could pocket the inflated difference, the Defendants caused millions of dollars in damages to Plaintiff and the Class.

**IV.    The Offering Defendants Sold Unregistered Securities Without a Valid Exemption**

100.    Section 5 of the Securities Act, 15 U.S.C. § 77e, makes it unlawful for any person, directly or indirectly, to offer or sell securities, unless a registration statement is filed with the SEC and is in effect as to such offer or sale.

101.    The Offering Defendants purported to offer the Series interests on the basis of Rule 506(c) of Regulation D, 17 C.F.R. § 230.506(c), an SEC regulation that provides a safe-harbor registration exemption under Securities Act Section 4(a)(2) for qualifying private offerings.

102.    However, Rule 506(d) of Regulation D provides for a "Bad Actor" disqualification that eliminates the possibility of using Rule 506(c) as a safe harbor for offering unregistered securities:

> No exemption under this section shall be available for a sale of securities if . . . any promoter connected with the issuer in any capacity at the time of such sale; . . . [or] any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities; . . . : . . . (ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice: (A) In connection with the purchase or sale of any security; (B) Involving the making of any false filing with the Commission; or . . . (iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934; . . .

17 C.F.R. § 230.506(d).

103.    Here, Pirello was undoubtedly a promoter and/or sales agent who profited in connection with Late Stage's sale of securities.

104.    Pirrello had an integral role in structuring and managing Late Stage, but Pirrello, Follano, Cilano, and the other Offering Defendants purposefully left Pirrello's name off documents relating to the Late Stage.

105.    During a meeting on October 21, 2021, Pirrello acknowledged that "we set the fund up," referring to himself, and his "friends" and "partners," meaning Follano and Cilano. Pirrello also acknowledged his management of the Late Stage and stated that "Prior2IPO…[is] the largest pre-IPO marketing company in the world.  And we have a pretty interesting structure, but Late Stage Funds is us, so all of our business goes into the Late Stage Funds." When asked if Follano "runs for the fund for you?," Pirrello replied that Follano "runs Late Stage" and agreed that Follano "essentially works for" Pirrello.

106.    Furthermore, Pirrello was an unregistered sales agents who acted as a securities broker. Pirrello managed the Late Stage sales force, which solicited investments in the Pre-IPO shares offered by Late Stage. Pirrello and Follano met with each supervisory sales agent who joined their sales force to go over the structure, procedures, and inner workings of their pre-IPO business.

107.    Pirrello had primary responsibility for managing the sales agents and directed a network of sales agents around the country through which he controlled the sales efforts for the Late Stage Funds.

108.    Pirrello and Follano caused the payment of transaction-based compensation that was a percentage of the amounts of money each of the Offering Defendants and their sales agents raised for the Late Stage to the Offering Defendants and their sales agents, including themselves. In fact, Pirrello received approximately $18.9 million in commissions from the sale of Pre-IPO shares' undisclosed markups.

109.    In connection with his 2019 securities fraud convictions, Perillo is subject to a Final Judgment permanently enjoining him from violations of Section 10(b) of the Exchange Act and Rule 10b-5. Pirrello is also subject to an order of the Commission entered pursuant to section 15(b) of the Exchange Act.

110.    In sum, Pirello qualifies as a bad actor, which prohibits Late Stage from utilizing Rule 506(c) as a safe harbor from registration. Accordingly, the Offering Defendants violated Section 5 by selling unregistered securities.

## CLASS ACTION ALLEGATIONS

111.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other investors in Late Stage who were harmed by Defendants' actions alleged herein (the "Class"). Excluded from the Class are Defendants and their immediate family members.

112.    This action is properly maintainable as a class action because:

a)    the Class is so numerous that joinder of all members is impracticable. Thousands of individuals and/or entities throughout the country were victims of this securities fraud. The actual number of investors will be ascertained through discovery;

b)    there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.    whether the Scheme Defendants engaged in a scheme to defraud investors;

ii.    whether the Offering Defendants used material false and/or misleading statements to induce investors into the fraudulent scheme;

iii.    whether the Control Defendants violated Section 20(a) of the Exchange Act; and

iv.    whether the Late Stage investment agreements are illegal unregistered securities offerings to which investors are entitled to recission.

c)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class;

f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g)    a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

### COUNT I – SCHEME LIABILITY
**(Against the Scheme Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and 10b-5(c) Promulgated Thereunder)**

113.    Plaintiff incorporates each and every allegation above as if fully set forth herein.

114.    Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

115.    Rule 10b-5, promulgated by the SEC pursuant to Section 10(b) of the Exchange Act, makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities

exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

116.    This Count is brought under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiff need not allege in this Count, nor prove in this case, that each of the Scheme Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

117.    From at least March 2019 through March 2023 (the "Class Period"), the Scheme Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiff and the Class; (ii) artificially inflate the values of Pre-IPO shares to skim profits; and (iii) cause Plaintiff and the Class to invest in Pre-IPO shares through Late Stage at artificially inflated prices.

118.    In furtherance of this unlawful plan, scheme, and course of conduct, the Scheme Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the Class in connection with their investments with Late Stage, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

119.    The Scheme Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included concealing Pirello's involvement with Late Stage, including his relationships to Green Life Farms and Earth to Energy, concealing that investors

were being sold Pre-IPO shares at artificially inflated prices, and pocketing the markups as profit. Ultimately, this conduct resulted in the Scheme Defendants deceiving investors about the fees associated with their investment, the prices Late Stage paid for their investment, the relationships between Late Stage, Green Life Farms, and Earth to Energy, and the applicability of Rule 506(c).

120.    Plaintiff and the Class reasonably relied upon the numerous representations that they would not pay any up front fees with their investment and that their investments were legal securities offerings.

121.    During the Class Period, Plaintiff and the Class were unaware of the Scheme Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiff and the Class known of the Scheme Defendants' unlawful scheme and unlawful course of conduct, they would not have invested with Late Stage.

122.    As a direct and proximate result of the Scheme Defendants' scheme to defraud and such unlawful course of conduct, Plaintiff and the Class suffered damages in connection with their investments with Late Stage during the Class Period.

123.    By reason of the foregoing, the Scheme Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiff and the Class for damages suffered in connection with their investments with Late Stage.

### <u>COUNT II – STATEMENT LIABILITY</u>
**(Against the Offering Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder)**

124.    Plaintiff incorporates each and every allegation above as if fully set forth herein

125.    Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the

purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

126.    Rule 10b-5, promulgated by the SEC pursuant to Section 10(b) of the Exchange Act, makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.14a-9.

127.    This Count is brought pursuant to Rule 10b-5(b) for false and misleading statements the Offering Defendants made to Late Stage investors in connection with the sale of Pre-IPO shares during the Class Period.

128.    During the Class Period, Defendants Pirrello, Follano, Nittolo, Cassino, Ditucci, Rivera, Prior2IPO, Late Stage, Pre IPO Marketing, and JLRE made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

129.    Defendants Pirrello, Follano, Nittolo, Cassino, Ditucci, Rivera, Prior2IPO, Late Stage, Pre IPO Marketing, and JLRE had actual knowledge of the misrepresentations and

omissions of material facts set forth in this Complaint, or recklessly disregarded the true facts that were available to them. Defendants Pirrello, Follano, Nittolo, Cassino, Ditucci, Rivera, Prior2IPO, Late Stage, Pre IPO Marketing, and JLRE engaged in this misconduct to conceal their markup commissions from potential Late Stage Investors and to induce Late Stage investors to invest in the Pre-IPO shares so that the defendants could earn their commissions.

130.    Plaintiff and the Class reasonably relied upon the numerous representations that they would not pay any up front fees with their investment, that Late Stage was paying the same price for the securities as the investors, that Pre-IPO Companies were unaffiliated with Late Stage, and that their investments were legal securities offerings.

131.    As a direct and proximate result of the Offering Defendants' false and/or misleading statements, Plaintiff and the Class suffered damages in connection with their investments with Late Stage during the Class Period.

132.    By reason of the foregoing, the Offering Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to Plaintiff and the Class for damages suffered in connection with their investments with Late Stage.

## COUNT III – CONTROL PERSON LIABILITY
### (Against the Control Defendants for Violations of Section 20(a) of the Exchange Act)

133.    Plaintiff incorporates each and every allegation above as if fully set forth herein.

134.    Section 20(a) of the Exchange Act states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ."

135.    The Control Defendants acted as control persons within the meaning of Section 20(a) of the Exchange Act.

136.     Individual Defendant Pirrello was the founder, owner, and controller of Prior2IPO. By virtue of his high-level position, participation in, and/or awareness of the company's operations, direct involvement in the day-to-day operations of the company, and/or intimate knowledge of the company's actual performance, and his power to control public statements by the company, Individual Defendant Pirrello had the power and ability to control the actions of Prior2IPO and its employees. By reason of such conduct, Individual Defendant Pirrello is liable pursuant to Section 20(a) of the Exchange Act.

137.     Individual Defendant Follano was the founder, Managing Partner, and President of Late Stage. By virtue of his high-level position, participation in, and/or awareness of the company's operations, direct involvement in the day-to-day operations of the company, and/or intimate knowledge of the company's actual performance, and his power to control public statements by the company, Individual Defendant Follano had the power and ability to control the actions of Late Stage and its employees. By reason of such conduct, Individual Defendant Follano is liable pursuant to Section 20(a) of the Exchange Act.

138.     Individual Defendant Cilano was the President, Sole Authorized Person and Managing Member of Capital Truth. By virtue of his high-level position, participation in, and/or awareness of the company's operations, direct involvement in the day-to-day operations of the company, and/or intimate knowledge of the company's actual performance, and his power to control public statements by the company, Individual Defendant Cilano had the power and ability to control the actions of Capital Truth and its employees. By reason of such conduct, Individual Defendant Cilano is liable pursuant to Section 20(a) of the Exchange Act.

139.     Individual Defendants Cassino and Ditucci were the co-owners of Pre IPO Marketing. By virtue of their high-level positions, participation in, and/or awareness of the

company's operations, direct involvement in the day-to-day operations of the company, and/or intimate knowledge of the company's actual performance, and their power to control public statements by the company, Individual Defendants Cassino and Ditucci had the power and ability to control the actions of Pre IPO Marketing and its employees. By reason of such conduct, Individual Defendants Cassino and Ditucci are liable pursuant to Section 20(a) of the Exchange Act.

140.    Individual Defendant Rivera was the owner of JLRE. By virtue of his high-level position, participation in, and/or awareness of the company's operations, direct involvement in the day-to-day operations of the company, and/or intimate knowledge of the company's actual performance, and his power to control public statements by the company, Individual Defendant Rivera had the power and ability to control the actions of JLRE and its employees. By reason of such conduct, Individual Defendant Rivera is liable pursuant to Section 20(a) of the Exchange Act.

141.    Individual Defendant Halle is the Chairman and CEO of Green Life Farms and Earth to Energy. By virtue of his high-level position, participation in, and/or awareness of the companies' operations, direct involvement in the day-to-day operations of the companies, and/or intimate knowledge of the companies' actual performance, and his power to control public statements by the companies, Individual Defendant Halle had the power and ability to control the actions of Green Life Farms and Earth to Energy and its employees. By reason of such conduct, Individual Defendant Halle is liable pursuant to Section 20(a) of the Exchange Act.

## COUNT IV – SECURITIES ACT VIOLATIONS
**(Against the Offering Defendants for Violations of Section 12 of the Securities Act)**

142.    Plaintiff incorporates each and every allegation above as if fully set forth herein.

143.    Section 12(a)(1) of the Securities Act provides an express private right for investors to bring civil actions against sellers who violate Section 5 of the Exchange Act: "Any person who

[] offers or sells a security in violation of Section 77e of this title . . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77l(a).

144.    Section 5 of the Securities Act makes it unlawful for any person, directly or indirectly, to offer or sell securities, unless a registration statement is filed with the Commission and is in effect as to such offer or sale: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2)to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e

145.    Rule 506 of Regulation D provides exemptions for limited offers and sales of unregistered securities: "Exemption. Offers and sales of securities by an issuer that satisfy the conditions in paragraph (b) or (c) of this section shall be deemed to be transactions not involving any public offering within the meaning of section 4(a)(2) of the Act." 17 CFR § 230.506(a).

146.    However, Rule 506(d) provides for a "Bad Actor" disqualification that eliminates the possibility of using a Rule 506 exemption as a safe harbor for offering unregistered securities:

> (d) "Bad Actor" disqualification. (1) No exemption under this section shall be available for a sale of securities if the issuer; any predecessor of the issuer; any affiliated issuer; any director, executive officer, other officer participating in the offering, general partner or managing member of the issuer; any beneficial owner of 20% or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power; any promoter connected with the issuer in any capacity at the time of such sale; any investment manager of an issuer that is a pooled investment fund; any person that has been or will be paid (directly or indirectly)

remuneration for solicitation of purchasers in connection with such sale of securities; any general partner or managing member of any such investment manager or solicitor; or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor:

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

    (A) In connection with the purchase or sale of any security;

    (B) Involving the making of any false filing with the Commission; or

    (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

    (A) In connection with the purchase or sale of any security;

    (B) Involving the making of any false filing with the Commission; or

    (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

    (A) At the time of such sale, bars the person from:

        (1) Association with an entity regulated by such commission, authority, agency, or officer;

        (2) Engaging in the business of securities, insurance or banking; or

        (3) Engaging in savings association or credit union activities; or

    (B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

    (A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

    (B) Places limitations on the activities, functions or operations of such person; or

    (C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

147.    Here, Pirrello is sufficiently connected to Late Stage for the Bad Actor disqualification to apply to Late Stage. Even if Pirello's own oral admissions that he is the operator of Late Stage is insufficient, he clearly acted as a promoter of Late Stage securities and was paid millions of dollars for soliciting investors to purchase Late Stage securities.

148.    Pirello also clearly meets the criteria as a bad actor. In connection with his 2019 securities fraud convictions, Perillo is subject to a Final Judgment permanently enjoining him from violations of Section 10(b) of the Exchange Act and Rule 10b-5. Pirrello is also subject to an order of the Commission entered pursuant to section 15(b) of the Exchange Act.

149.    Accordingly, Rule 506(d) applies and the Rule 506(c) exemption utilized by Late Stage is statutorily prohibited, meaning that PPMs and side letters entered into between the

investors and Late Stage are illegal, unregistered securities offerings in violation of Section 5 of the Securities Act.

150.    Each of the Offering Defendants is a seller under the meaning of Section 12(a)(1) because they either signed the PPMs on behalf of Late Stage or solicited investors to invest in Late Stage securities that violated Section 5 in exchange for personal gain. Indeed, the Offering Defendants made millions of dollars in commissions from Late Stage.

151.    Therefore, each of the Offering Defendants is liable to repay to Plaintiff and the Class the consideration they paid Late Stage with interest thereon and/or damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representatives and his counsel as Class Counsel;

B.    Awarding Plaintiff and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest;

C.    Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.    Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

//

Dated: July 29, 2024

**HACH ROSE SCHIRRIPA
& CHEVERIE LLP**

*/s/ John W. Baylet*_____
John W. Baylet
Frank R. Schirripa
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel: (212) 213-8311
Fax: (212) 779-0028
Email:  jbaylet@hrsclaw.com
        fschirripa@hrsclaw.com

*Attorneys for Plaintiff*