**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- X
ARMAND EVANGELISTA, Individually And
on Behalf of All Others Similarly Situated,
               Plaintiff,

        -against-

LATE STAGE ASSET MANAGEMENT,
LLC, PRIOR 2 IPO INC., CAPITAL TRUTH
HOLDINGS LLC, CAPITAL TRUTH
ADVISORS LLC PRE-IPO MARKETING
INC., JL RIVERA ENTERPRISES LTD.,
VALEO CAPITAL CORPORATION, VERO
ENTERPRISE HOLDINGS LLC, EARTH TO
ENERGY, INC., AMERICAN BIOCARBON,
LLC, GREEN LIFE FARMS, INC., CS
SOLUTIONS, INC., RAYMOND J.
PIRRELLO, JR., MARCELLO FOLLANO,
JOSHUA CILANO, ROBERT CASSINO,
ANTHONY DITUCCI, JOSEPH RIVERA,
JOSEPH PASSALAQUA and JEAN HALLE,

               Defendants.

-------------------------------------------------------------- X

Case No. 24-cv-05292-KAM-MMH

**Amended Class Action Complaint**

**Jury Trial Demanded**

Lead Plaintiff Jack Dean Pitman and named Plaintiffs Stephen Stewart and Adam Utley ("Plaintiffs" or "Investors") allege the following based upon personal knowledge as to themselves, and upon an investigation conducted by and through their attorneys, which included a review of public documents, news articles and information available via the internet concerning Defendants (defined below), information obtained from individuals with knowledge about the events discussed herein, the complaint in *Securities Exchange Commission v. Raymond J. Pirrello, Jr., et al.,* Case No. 2:23-cv-0853-KAM-MMH (E.D.N.Y.) ("SEC Action") dated December 6, 2023 ("SEC Complaint")[1], and the Superseding Indictment dated February 10, 2025 ("Superseding Indictment")[2] and other documents filed in *United States of America v. Raymond John Pirrello, Jr., et al.,* Case 1:23-cr-00499-KAM (E.D.N.Y.) (the "Criminal Action").[3] Plaintiffs believe that substantial evidentiary matter will likely exist for the allegations herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## I.    INTRODUCTION

1.    Investors bring this securities class action on behalf of a class consisting of all persons and entities who purchased various series limited liability "pre-IPO" company membership interests ("Series Interests" or "Securities") through the Late Stage Funds[4] between March 1, 2019, and December 6, 2023, and who were damaged thereby (the "Class Period").

---

[1] 1:23-cv-08953, Dkt. No. 1.

[2] *U.S.A. v. Pirrello, et al.*, 1:23-cr-00499-KAM, Dkt. No. 44.

[3] Plaintiffs incorporate by reference herein in their entirety the SEC Complaint and Superseding Indictment.

[4] The Late Stage Funds means each of the limited liability companies managed by Late Stage Asset Management, of which there are at least 50, numbered sequentially in roman numerals (e.g. Late Stage Investment Fund XLIX LLC) that acquire, hold and/or sell securities on a forward purchase contract in securities of a particular private company/companies.

Excluded from the Class are: (a) all Defendants (defined below) and all present or former officers, directors, and employees of Defendants and such excluded persons' affiliates, subsidiaries, members of such excluded persons' immediate families and their legal representatives, heirs, successors or assigns and, (b) any entity that any Defendant or any excluded person under (a) controlled or has or had a material ownership interest in. Also excluded from the Class is any person who timely and validly requests exclusion from the Class. Investors seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act"), the Securities Act of 1933 ("Securities Act") and the New Jersey Uniform Securities Act ("N.J.U.S.A."). This action charges that the defendants named herein violated Sections 10(b)-5(a)-(c), 20(a), and 15(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission, Section 12(a)(1) of the Securities Act, and Sections 71 and 56 of the N.J.U.S.A.

2.      Each of the Defendants named herein participated in a fraudulent scheme involving the sale of unregistered securities in private companies that were purportedly preparing to go public. Defendants touted these securities to investors as a rare opportunity to obtain pre-IPO shares in attractive companies that would ballon in value following anticipated initial public offerings.

3.      Unbeknownst to investors, the price of the securities they purchased did not reflect their actual price. Instead, Defendants- limited only by the bounds of their greed- marked up the price of the securities they sold to investors by as much as 150% and pocketed the difference. Indeed, the SEC Complaint and Superseding Indictment establish that from March 2019 to July 2022 alone Defendants raised approximately $528 million from more than 4,000 investors and paid themselves and their agents approximately $88.6 million in undisclosed markups.[5]

---

[5] SEC Complaint ¶2; Superseding Indictment ¶27.

4.      Raymond J. Pirrello, Jr., ("Pirrello") is the primary architect of the fraudulent scheme. In August 2019, a jury found Pirrello guilty of insider trading in an SEC enforcement action unrelated to this fraud. The SEC then barred him from the securities brokerage industry.

5.      Pirrello teamed up with Marcello Follano ("Follano") and Joshua Cilano ("Cilano"), who had all worked together in various brokerages since 2007. Follano is the founder and managing partner of Late Stage Asset Management, LLC ("Late Stage"), and Cilano is the president and managing member of Capital Truth Holdings, LLC ("Capital Truth"). Pirrello and Follano established the Late Stage Funds, approximately 50 separate investment funds organized as LLC's for the purpose of investing in various private companies that were purportedly planning to go public in the near term. Capital Truth and Cilano, in turn, acquired and held the actual shares in the private companies (the "Securities" or "Series Interests") in Capital Truth, which would be distributed to investors in the Late Stage Funds, if and when an IPO or liquidity event took place.

6.      Pirrello and Follano drafted the offering documents issued to investors in connection with the Late Stage Funds. Each investor in a given Late Stage Fund would receive a letter, subscription agreement, operating agreement and private placement memorandum ("PPM") (collectively the "Offering Documents"). The Offering Documents all contained substantially the same language but for the description of the private company at issue.

7.      The Offering Documents failed to disclose the markups, telling investors instead that Late Stage would only make money if the underlying private company went public. In that case Late Stage would take only a 20% carried interest[6] of the amount invested. The Offering Documents also failed to disclose Pirrello's role in the securities offerings- despite his history as a convicted fraudster- and falsely claimed that the Securities in the Late Stage Funds qualified for an exemption from the registration requirements of the federal securities laws. In truth, because of Pirrello's involvement in the Late Stage Funds, and his status as a "bad actor" under SEC regulations, no such exemptions applied. Defendants sold illegal securities.

8.      To market and sell these illegal securities Defendants used a network of unregistered sales agents through various companies Pirrello controlled directly or indirectly. None of the sales agents were licensed broker-broker dealers or associated with registered brokerage firms.

9.      Prior2IPO, Pre-IPO Marketing, and JL Rivera Enterprises are three such companies. Pirrello founded Prior2IPO. Pre-IPO Marketing and JL Rivera Enterprises are two of Prior2IPO's branch offices. Robert Cassino ("Cassino") and Anthony DiTucci ("DiTucci") led operations at Pre-IPO Marketing. Joseph Rivera ("Rivera") led operations at JL Rivera Enterprises.

10.     Pirrello and Follano, along with Prior2IPO CEO Joseph Passalaqua ("Passalaqua"), Cassino, Rivera, and DiTucci explicitly instructed their salesforce to never mention markups or Raymond Pirrello's name, given his securities fraud conviction. Instead, Defendants and their salesforce referred to Pirrello (and Pirrello referred to himself) as "our founder Raymond John."

---

[6] Carried interest is the share of an investments fund's profits and refers to performance based compensation that the fund only recoups if the investment generates a return. By contrast, a management fee refers to a periodic payment based on an investment fund's assets under management.

11.    Salespeople at the sales offices sold investments in Late Stage using lists of accredited investors and cold calling them. The websites, social media accounts, and marketing material for Prior2IPO and its branch offices all stated that the Funds had no up-front fees, with the only fees being the 20% carried interest of the profits upon exit of the investment. Pirrello, Follano, and Cilano dictated the pitch language, marketing presentations, and social media posts used to market the Securities sold through the Late Stage Funds.

12.    For example, Prior2IPO marketing presentations stated: "Our company Prior2IPO was created with the purpose to bring our members the best opportunities in the world without the typical fee structures of the average brokers and advisors. (WE CHARGE YOU ZERO.)" Prior2IPO's website and social media posts contained similar representations.

13.    While Defendants offered Securities in the Late Stage Funds in some well-known private companies which generated media attention and did eventually go public, Defendants enticed investors with the opportunity to invest in these attractive companies and then heavily solicited investors to purchase Securities of unknown companies about which little to no publicly available information existed.

14.    Two such companies are Green Life Farms ("Green Life Farms") and Earth to Energy/American Biocarbon ("Earth to Energy"). Defendant John Halle ("Halle") is the CEO of both companies, and his investment company CS Solutions, Inc. ("CSS") manages the "business and affairs" of both. Halle essentially raises funds for purportedly "clean-tech" companies by "recommending opportunities for institutional and accredited investors."

15.     Unbeknownst to investors, and contrary to the representations in the Offering Documents that "The [Late Stage] Fund is not related to" and "has no further information about" Green Life Farms or Earth to Energy, Halle and Pirrello are business partners and Pirrello played an instrumental role in both companies. Pirrello and Halle also teamed up to raise funds for another CSS company, Burgess BioPower, a power plant in New Hampshire that went bankrupt.

16.     As the founder of Green Life Farms, and "Public Relations Specialist" at both Earth to Energy and Green Life Farms, Pirrello solicited investments in both companies through the Late Stage Funds, while concealing his identity and criminal history. Halle knew this, and because his Company CSS disseminated solicitations for investments in Green Life Farms and Earth to Energy through the Late Stage Funds which referenced the highly marked up prices of shares in these companies, Halle was well aware of the markups.

17.     Indeed, in soliciting investors, Defendants billed Green Life Farms and Earth to Energy as their "top companies," and, not coincidentally marked up the price of their shares by the highest percentages. For example, on December 23, 2020, Pirrello sent a text message to Cassino, Passalaqua, and Rivera, instructing them: "Green Life New Pricing $6, cost $3," reflecting a 100% markup.[7]

18.     While Green Life Farms and Earth to Energy, under Halle's direction were portrayed as entities independent of Pirrello and Late Stage, in truth they are alter egos and agents of both and essentially acted as one company in committing securities fraud.

19.     On December 5, 2023, the U.S. Attorneys' Office for the Eastern District of New York indicted and charged Pirello with conspiracy to commit securities fraud, conspiracy to commit wire fraud, and securities fraud. His bail was set at $2 million.

---

[7] Superseding Indictment ¶24.

20.     The next day, the SEC filed the SEC Complaint against Pirrello, Follano, Cassino, DiTucci, Rivera, Prior2IPO, Late Stage, Pre-IPO Marketing and JL Rivera. The SEC Complaint described the fraudulent scheme, Defendants' illegal sale of unregistered securities, and Defendants' intentional concealment of Pirrello's identity and pivotal role in the Late Stage Funds. The Court stayed the SEC Action pending the resolution of the Criminal Action.

21.     On February 10, 2025, the Superseding Indictment issued. The Court unsealed the Superseding Indictment on February 13, 2025. The Superseding Indictment charged Pirrello, Cassino, Passalaqua and Rivera. While it did not formally charge Late Stage and Follano, or Truth Capital and Cilano, it described Follano and Cilano as co-conspirators who "dictated the pitch language that was used by employees at Prior2IPO to market investments in Late Stage."[8]

22.     Trial in the Criminal Action is set to begin on April 6, 2026.

23.     Investors seek to recover for the losses incurred as a direct and proximate result of Defendants' illegal conduct.

## II.     **PARTIES**

24.     Lead Plaintiff Jack Dean Pitman purchased pre-IPO Securities in various private companies offered by Defendants in the Late Stage Funds through subscription agreements with Late Stage and suffered damages as a result of the legal violations alleged herein. Mr. Pitman's PSLRA certification was filed at Dkt. No. 9-2 and is incorporated by reference herein.

25.     Named Plaintiff Stephen Stewart purchased pre-IPO Securities in various private companies offered by Defendants in the Late Stage Funds through subscription agreements with Late Stage and suffered damages as a result of the legal violations alleged herein. Mr. Stewart's PSLRA certification was filed at Dkt. No. 9-2 (p. 5-6) and is incorporated by reference herein.

---

[8] Superseding Indictment, ¶¶11, 12, 20.[8]

26. Named Plaintiff Adam Utley purchased pre-IPO Securities in various private companies offered by Defendants in the Late Stage Funds through subscription agreements with Late Stage and suffered damages as a result of the legal violations alleged herein. Mr. Utley's PSLRA certification was filed at Dkt. No. 9-2, (p. 7-6), and is incorporated by reference

27. Defendant Late Stage Asset Management, LLC ("Late Stage") is a Delaware limited liability company formed in February 2015 with its principal place of business at 26 Park Street in Montclair, New Jersey. Late Stage was the manager of the various Late Stage Funds. Late Stage has never been registered with the SEC in any capacity.

28. Defendant Prior 2 IPO Inc. ("Prior 2 IPO") is a New Jersey corporation incorporated in February 2017 with its principal place of business in Sparta, New Jersey. Prior2IPO solicited investors for pre-IPO investment opportunities through Late Stage Funds. It has never been registered with the SEC in any capacity.

29. Defendant Pre IPO Marketing Inc. ("Pre IPO Marketing") is a New York corporation incorporated in July 2018 with its principal place of business in Freeport, New York. Pre IPO Marketing operated as a branch office of Prior2IPO, soliciting investors for pre-IPO investment opportunities through Late Stage Funds. It has never been registered with the SEC in any capacity.

30. Defendant JL Rivera Enterprises Ltd ("JLRE") is a New York corporation incorporated in April 2020 with its principal place of business in Elmont, New York. JLRE operated as a branch office of Prior2IPO, soliciting investors for pre-IPO investment opportunities through Late Stage Funds. It has never been registered with the SEC in any capacity.

31. Defendant Valeo Capital Corporation ("Valeo Capital") is a New Jersey corporation incorporated in June 2017 with its principal place of business in Sparta, New Jersey.

9

Pirrello owned and controlled Valeo Capital.

32.    Defendant Vero Enterprise Holdings LLC ("Vero Enterprise") is a New Jersey limited liability company formed in December 2018 with its principal place of business in Montclair, New Jersey. Follano owned and controlled Vero Enterprise. Follano is listed as the registered agent for Vero Enterprise.

33.    Defendant Capital Truth Holdings LLC ("Capital Truth"), a Delaware limited liability company, was the entity which purportedly held the shares of Pre-IPO companies out of which the Late Stage Funds offered the pre-IPO Securities to investors. As of July 2023, Capital Truth was the largest shareholder in Green Life Farms, holding over 60% of its outstanding shares. Likewise, as of July 2023, Capital Truth was the largest single shareholder in Earth to Energy. Capital Truth was also a major early-stage investor in Triller, holding 3 million of its outstanding shares.  Cilano is the President of Capital Truth. Capital Truth has never been registered with the SEC in any capacity. Capital Truth is referred to as "Company A" in the SEC Complaint.[9]

34.    Defendant Capital Truth Advisors ("Capital Truth Advisors") is a California limited liability company with its principal place of business in San Francisco, California. Upon information and belief, Capital Truth and Capital Truth Advisors are related entities. Capital Truth Advisors is listed as the "Manager" in the subscription agreements for certain of the Late Stage Funds. Follano is the Manager of Capital Truth Advisors. Late Stage and Capital Truth Advisors share the same phone number.

35.    Defendant Green Life Farms, Inc. ("Green Life Farms") is a privately held Florida corporation purportedly using hydroponic growing techniques to grow lettuces and other

---

[9] SEC Complaint ¶30.

vegetables, with a principal place of business in Lake Worth, Florida. Late Stage offered investors the opportunity to purchase Green Life Farms pre-IPO Securities through the Late Stage Funds. Green Life Farms was founded by Pirrello. Pirrello held the title of Public Relations Specialist at Green Life Farms. Capital Truth was the largest shareholder of Green Life Farms, holding over 60% of its outstanding shares. Pirrello was also major shareholder of Green Life Farms.

36.    Defendants Earth to Energy, Inc., a Florida corporation, and its affiliate American Biocarbon, LLC, a Louisiana limited liability company (together, "Earth to Energy"), are privately held companies purportedly producing pellets made from sugar cane waste and biochar to be used as a soil supplement. Earth to Energy's principal place of business is in White Castle, Louisiana. Late Stage offered investors the opportunity to purchase Earth to Energy Securities through the Late Stage Funds. Pirrello held the title of Public Relations Specialist at Earth to Energy. Earth to Energy's press releases directed Investor Relations inquiries to Pirrello. Capital Truth was the single largest shareholder of Earth to Energy.

37.    Defendant CS Solutions, Inc., also known as "CS Operations" ("CSS") is a Florida Corporation incorporated in 2018. CSS is an investment company that purports to provide operations and asset management services to early stage clean-teach companies, as well as "opportunity evaluations." By working with its "parent network" CSS purports to "originate, evaluate and recommend opportunities for institutional and accredited investors." CSS manages the business and affairs of Green Life Farms and Earth to Energy. CSS solicited investors to purchase shares of Green Life Farms and Earth to Energy through Late Stage.

38.    Defendant Raymond J. Pirrello, Jr. ("Pirrello") was the founder and owner of Prior2IPO. Pirrello is also the founder of Late Stage. On August 14, 2019, a jury found Pirrello found liable for insider trading in an SEC action brought in the Northern District of Georgia. On

September 9, 2019, the court in that action enjoined Pirrello from future violations of Sections 10(b) and 14(e) of the Exchange Act. Then, on September 23, 2019, the SEC barred Pirrello from "associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer against, or nationally recognized statistical rating organization and from participating in any offering of a penny stock." Raymond J. Pirrello, Jr., Exchange Act Release No. 870444 (Sept. 23, 2019). Pirrello has not been licensed or registered with the SEC since at least the beginning of the Class Period. Pirrello was the founder and major stockholder of Green Life Farms. Pirello was the Public Relations Specialist and head of Investor Relations at Green Life Farms and Earth to Energy. Pirello was indicted in connection with the Criminal Action and is a defendant in the SEC Action.

39.    Defendant Marcello Follano ("Follano") was the founder, Managing Partner, and President of Late Stage and the Late Stage Funds. Follano is also listed as the "Manager" of Capital Truth Advisors. From 2006 to 2015, Follano was a registered representative associated with various broker-dealers registered with the SEC. From at least March 2019, Follano was not licensed or registered with the SEC in any capacity. Follano is a defendant in the SEC Action. Follano is referred to as "Co-Conspirator 1" in the Superseding Indictment.[10] Follano signed many of the subscription agreements, private placement memoranda ("PPMs") and side letters of the Late Stage Funds.

40.    Defendant Jean R. Halle, aka John Halle, ("Halle") is the Chairman and CEO of Green Life Farms and Earth to Energy and the Executive Chairman and founder of CSS. According to Green Life Farms Rights Offering Private Placement Memorandum, Halle is responsible for "strategic planning and overall corporate growth including assessing opportunities and developing

---

[10] Superseding Indictment, ¶11.

new business." Further, "Mr. Halle is a recognized leader at raising funds through both private equity and institutional markets and have special expertise related to investments involving energy, infrastructure, and complex financing transactions." Halle solicited investors to purchase shares in Green Life Farms and Earth to Energy through the Late Stage Funds.

41.     Defendant Joshua Cilano ("Cilano") was the President, Sole Authorized Person and Managing Member of Capital Truth. Cilano teamed up with Pirello and Follano from Late Stage's inception and was one of the main architects of the fraudulent scheme alleged herein. Cilano is referred to "Individual A" in the SEC Complaint, and as "Co-Conspirator 2" in the Superseding Indictment.[11]

42.      Defendant Robert Cassino ("Cassino") was a co-owner of Pre IPO Marketing. From 1993 to 2008, Cassino was a registered representative associated with various broker-dealers registered with the SEC. From at least March 2019, Cassino was not licensed or registered with the SEC in any capacity. Cassino was indicted in connection with the Criminal Action.

43.     Individual Defendant Anthony Ditucci ("Ditucci") was a co-owner of Pre IPO Marketing. From 2014 to 2016, DiTucci was a registered representative associated with various broker-dealers registered with the SEC. From at least March 2019, DiTucci was not licensed or registered with the SEC in any capacity.

44.     Defendant Joseph Rivera ("Rivera") was the owner of JLRE. From 2000 to 2012, Rivera worked as a registered representative associated with various broker-dealers registered with the SEC. From at least March 2019, Rivera was not licensed or registered with the SEC in any capacity. Rivera was indicted in connection with the Criminal Action. On July 8, 2025, Rivera withdrew his previous plea of not guilty and entered a guilty plea in connection with Count II of

---

[11] SEC Complaint ¶¶25, 84; Superseding Indictment, ¶12.

the Superseding Indictment, conspiracy to commit wire fraud.[12]  On July 8, 2025 the U.S. Attorney for the Eastern District of New York filed an Information charging Rivera with intentionally conspiring, (with other unnamed individuals) to destroy documents and evidence for use in a grand jury investigation.[13]

45.     Defendant Joseph Passalaqua ("Passalaqua") was the Chief Executive Officer of Prior2IPO. Passalaqua was indicted in connection with the Criminal Action.  Pirello and Passalaqua together ran Prior2IPO, the largest sales office.

46.     Defendants Pre IPO Marketing and JLRE were branch offices and affiliates of Prior2IPO and are collectively referred to herein with Prior2IPO as "Prior2IPO." Prior2IPO, under Pirrello's direction and control, also established various branch sales offices throughout the country with names such as "PreIPO Corporation," operating out of Boca Raton, Florida, and "B4IPO," operating out of Westbury, New York.

47.     Defendants Pirrello, Follano, Cassino, Ditucci, Rivera, Cilano, Passalaqua, Halle, Late Stage, Prior2IPO, Pre IPO Marketing, JLRE, Valeo Capital, Vero Enterprise, Capital Truth, Capital Truth Advisors, CS Solutions Earth To Energy, and Green Life Farms are collectively referred to herein as the "Defendants."

### III.    JURISDICTION AND VENUE

48.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiffs allege violations of Securities Act and the Exchange Act, and pursuant to 28 U.S.C. §1367 (supplemental

---

[12] 1:23-cr-00499-KAM, Dkt. No. 44, ¶32 (Superseding Indictment dated Feb. 10, 2025) and Dkt. No. 104 (Criminal Cause for Pleading, dated July 8, 2025).
[13] 1:23-cr-00499-KAM,Dkt. No. 100.

jurisdiction). Alternatively, this Court has jurisdiction under 28 U.S.C. §1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because Plaintiffs and at least one Defendant are citizens of different states.

49.     This Court may exercise jurisdiction over Defendants because they have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, the SEC Complaint and the Superseding Indictment, subjecting themselves to personal jurisdiction in this District and rendering this Court's exercise of jurisdiction proper and necessary.

50.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because certain Defendants live and/or conduct business in this District, and therefore, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District. Defendants are found or are inhabitants or transact business in this District.

## IV.    DEFENDANTS' ILLEGAL CONDUCT

### A.    *Background on the Securities at Issue*

51.     Securities in a private company prior to it becoming publicly traded on a national exchange through an initial public offering ("IPO") or otherwise are often held by the founders and employees of that company, their family members, and other early-stage investors. These "pre-IPO" shares are not available to the investing public.

52.     Depending on the amount of "buzz" associated with a private company, pre-IPO shares are attractive to investors because they offer investors the hope of a large profit in the event the private company goes public and demand for its shares thereafter increases, driving up its price.

53.     The Late Stage Funds were a group of over fifty private investment funds organized as LLCs, generally named in numbered sequences, *e.g.,* "Late Stage Investment Fund VII, LLC." Each Late Stage Fund contained shares of one or more pre-IPO companies, and each Series was established for the purpose of investing in a specific pre-IPO company.

54.     Late Stage sold Interests in a given Series of a Late Stage Fund to investors.

55.     Defendant Cilano, through his company Capital Truth, had primary responsibility for identifying and then acquiring pre-IPO shares on behalf of the Late Stage Funds.

56.     Once Cilano acquired the pre-IPO shares, Follano, through Late Stage, caused the Late Stage Funds to purchase the rights to those pre-IPO shares from Capital Truth.

57.      Capital Truth held the shares until a liquidity event (an IPO, direct listing or reverse merger), at which time the shares were distributed to the management of Late Stage Funds, who were supposed to distribute the shares to investors.

58.     Each Late Stage Fund used similar offering documents with substantially similar language. All investors received a general series investment letter, a private placement memorandum ("PPM"), an operating agreement, a subscription booklet, a series-specific signature page to sign and date, an investor or "member" questionnaire, and wiring instructions (collectively, the "Offering Documents.").

59.     Follano was named in some of the PPMs at the "Managing Partner of Late Stage Asset management LLC since its inception." Those PPMs touted Follano's background and experience in the securities industry, and his "expertise in private pre-IPO opportunities."

**B.     The Mechanics of the Fraudulent Offerings/ Defendants' Fraudulent Scheme**

60.     Pirrello, Follano, and Cilano have worked in the securities industry and have worked together, overlapping at various brokerages, since 2007.

16

61.    From 1996 to 2016, Pirrello was a registered representative associated with various broker-dealers registered with the SEC.

62.    On July 7, 2016, the SEC filed a complaint against Pirrello for insider trading. *Securities and Exchange Commission v. Pirrello*, No. 1:16-cv-02459 (N.D. Ga. Jul 07, 2016). On August 14, 2019, a jury found Pirrello guilty of three separate violations of Section 10(b) and Rule 10b-5 and two separate violations of Section 14(e) and Rule 14e-3 all related to the insider trading ring Pirrello orchestrated. On September 9, 2019, the court entered a final judgment enjoining Pirrello from future violations of Sections 10(b) and 14(e) of the Exchange Act, and Rules 10b-5 and 14e-3 thereunder. On September 23, 2019, the SEC barred Pirrello from associating with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization, and from participating in any offering of a penny stock.

63.    From at least March 2019, Pirrello was not licensed or registered with the SEC in any capacity and was banned from conducting business in the securities industry in any capacity. Despite this, Pirello partnered with Follano and Cilano to form his next fraudulent securities scheme: Late Stage and Prior2IPO.

64.    Pirrello, Follano and Cilano, through the inter-related entities they controlled, spearheaded a fraudulent scheme using a network of sales offices across the country that illegally solicited investors to purchase unregistered pre-IPO shares in the Late Stage Funds through Late Stage.

65.    Prior2IPO and its affiliate branch offices, Pre IPO Marketing, and JLRE (collectively, the "Prior2IPO"),[14] functioned as the sales offices that solicited investors to purchase

---

[14]In an email dated November 11, 2019, Pirrello instructed sales agents associated with other sales offices that if their emails used the name of the sales office, they should "edit the disclaimer to say

shares in the Late Stage Funds through Late Stage. Prior2IPO also operated additional sales offices under various names, including PreIPO Corporation located in Boca Raton, Florida.

66.     Pirello controlled the solicitation and sales efforts for Late Stage through Prior2IPO and its affiliate sales offices. Pirrello and Follano set the price per share at which the pre-IPO shares in the various Late Stage Funds would be sold to investors, and upon information and belief, both drafted the fraudulent and misleading Offering Documents.

67.     Pirrello and Follano met with each supervisory sales agent who joined their sales force to go over the structure, procedures and inner workings of their pre-IPO business.[15]

68.     Pirrello oversaw and managed the supervising sales agents of the other sales offices affiliated with Prior2IPO, including Cassino, DiTucci, Rivera, Pre IPO Marketing, and JLRE. Pirrello directed Prior2IPO and its sales agents to tell investors that there were no upfront fees, and to never mention commissions or markups.

69.     Follano had primary responsibility for handling investor funds which were deposited into bank accounts held by the various Late Stage Funds and controlled by Follano.[16]

70.     Sales agents at Prior2IPO solicited  investments in Late Stage by cold-calling lists of accredited investors, soliciting via websites, and social media marketing. Prior2IPO's various sales offices solicited investors using pitch materials and slide decks touting Late Stage and Prior2IPO's expertise and pedigree.

71.     For example, a Pre-IPO Ventures pitchbook stated:

 Pre-IPO Ventures uses expertise in social media marketing to increase client acquisition and lead generation in the industry. Since working with our largest client, Late Stage Investment Family of Funds, we have increased member base and assets by over 1000%. Pre-IPO Ventures is comprised of a team that holds over 100 years of combined experience in the marketing, financial, and technology industries and has grown to a member base of

---

you['re] from Prior2IPO." SEC Complaint ¶150.
[15] SEC Complaint ¶144.
[16] SEC Complaint ¶145.

over 20,000 members. Pre-IPO Ventures connects private accredited investors to shares of the largest industry disruptors. Sometimes at discounts as much as 50% of the expected IPO. By choosing the strongest disruptors in their industries, your opportunity moves from beyond buying to cherry-picking the best opportunities in the world for your portfolio, in turn maximizing profits for your portfolio.

72.    As to Late Stage, the deck touted that "Late Stage Fund managers and their staff are largely considered the founding fathers of the Pre-IPO space, initially offering Facebook at $6/share… Late Stage Funds maintains inventory of all of the companies the members are looking for. For example: companies such as Impossible Foods, Airbnb, Wish, Palantir, and Green Life Farms" and offers the "Best opportunities in the world for your portfolio in turn, maximizing your profits for your portfolio."

73.    Pirrello and Follano also personally solicited investors, utilizing substantially similar representations. For example, Pirrello stated in a July 19, 2021, email to a Late Stage investor that "Prior2IPO connects investors to the Late Stage Fund who presents pricing and opportunities unparalleled by our competitors."

74.    While Defendants lured investors to purchase securities in the Late Stage Funds touting well-known private companies, once they had them on the hook they would heavily solicit investments in Green Life Farms and Earth to Energy.  Indeed, in written solicitations, Pirello and the Prior2IPO salesforce uniformly represented Earth to Energy and Green Life Farms as their "top companies."

75.    Pirrello and Follano created the pitches to investors, which led them to believe that all of the money they were investing was being used to purchase Pre-IPO Securities, as discussed further below. In truth, only a portion of the investors' funds were utilized to purchase the Securities. Instead, Defendants purchased the private company shares at a fraction of their purported prices and charged investors substantial markups on the Pre-IPO shares—in some

instances, up to 150% of the share price. Pirrello, Follano, and Cilano pocketed this markup, and used a portion of it to pay the other Individual Defendants and their salespeople through the various entities they controlled.

76.    The undisclosed illegal markups were distributed as follows: First, when Late Stage received funds from investors for the Securities they purportedly purchased, it transferred the funds to Capital Truth. Second, Capital Truth then distributed the markup amount to Vero Enterprises and Valeo Capital. Capital Truth would pay Vero Enterprise for Follano, and Valeo Capital for Pirrello. Third, Prior2IPO sales agents sent invoices for their share of the markups to Pirrello through Valeo Capital. In turn, Pirrello caused Valeo Capital to pay Cassino, DiTucci, Rivera, and Passalaqua as well as their sales agents' transaction-based commissions based on the number of Pre-IPO shares they sold to investors.

77.    According to the SEC Complaint, Between 2019 and 2022, Valeo Capital received approximately $78 million from Capital Truth in the form of undisclosed markups to Prior2IPO and its affiliated sales entities and agents. Pirrello received over $18 million of that amount, representing Pirrello's personal share of the fraudulently obtained markups. Vero Enterprise received approximately $10.3 million from Capital Truth, representing Follano's share of the fraudulently obtained undisclosed markups.[17]

78.    Cassino and DiTucci, through Pre IPO Marketing, received approximately $9.3 million in fraudulently obtained undisclosed markups taken from Late Stage investors.[18]

79.    Rivera, through JLRE, received approximately $3.6 million in fraudulently obtained undisclosed markups taken from Late Stage investors.[19]

---

[17] SEC Complaint ¶¶79-80, 159.
[18] SEC Complaint ¶119.
[19] SEC Complaint ¶120.

### C.    Defendants Marked Up the Price of the Securities They Offered Investors and Lied to Investors Concerning the Markups

#### 1.    Upfront Markups Charged to Pre-IPO Shares

80.    Pirrello regularly communicated with the Prior2IPO sales agents, including Cassino, DiTucci, and Rivera, through text, email, and by posting to a shared Dropbox account regarding the inventory of available Pre-IPO shares and their pricing.

81.    Pirello, in consultation with Follano, set the equivalent price per share at which the corresponding Series Interests/Securities were to be sold to investors.

82.    Pirrello placed inventory lists and pricing sheets in a shared Dropbox account and identified the Late Stage Fund's cost for Pre-IPO shares, the fixed price(s) shares could be sold for, the number of shares available, the Pre-IPO Company's outstanding shares, its current valuation, and its projected IPO valuation. These pricing lists made it crystal clear to Defendants and their sales agents that Prior2IPO was charging up-front markups (ranging between 3% and 150%) on the Pre-IPO Securities because sales agents could see that the prices they were selling Pre-IPO shares to investors at was higher than the prices at which Late Stage Funds purchased the Pre-IPO shares—in fact, that is how they got paid.

83.    When new inventory of Pre-IPO shares became available, Pirello would text sales agents the number of shares available, the price the shares were acquired at, and the price at which the Pre-IPO shares were to be sold to Late Stage investors. For example:

- On June 20, 2020, Pirello texted Prior2IPO's sales agents, including Cassino, DiTucci, and Rivera, instructing them to sell Pre-IPO shares acquired at $45 to investors at $55.

- On June 23, 2020, Pirello texted Prior2IPO's sales agents, including Cassino, DiTucci,

and Rivera, instructing them to sell Pre-IPO shares acquired at $105 to investors at $125.

- On December 23, 2020, Pirrello texted Prior2IPO's sales agents: "Green Life New Pricing $6 cost $3."

- On February 24, 2021, Pirello texted Prior2IPO's sales agents instructing them to sell Pre-IPO shares of Green Farms acquired at $10 to investors at $15.[20]

84.    Pirrello instructed sales agents they would get paid "fifty percent of the markup that we created, and they get fifty percent of the carried interest." So, sales agents used these spread figures to keep track of their markups to invoice Pirello through Valeo Capital. Sales agents received their share of the upfront markups in cash and their share of the back-end carried interest in shares of the investors' stock.

85.    Accordingly, Defendants and their sales agents not only knew exactly how much of a markup they were charging investors on Pre-IPO shares but were incentivized and expressly compensated based on that markup.

86.    In order to maximize sales, and collect their portion of the markup, it was important that sales agents withhold this information from potential investors. To be sure, Cassino, DiTucci, and Rivera were well aware of and actively participated in this fraudulent scheme.

87.    As Rivera explained to a Prior2IPO sales agent in a phone call on March 8, 2022: "as far as the clients are concerned, like, there's no upfront fees. There's nothing on the paperwork, there's no markup there or anything. So, yeah, you don't have to worry about that."[21]

---

[20] SEC Complaint ¶¶104-105; Superseding Indictment ¶¶24-25.
[21] SEC Complaint ¶112.

88.     On March 16, 2022, Rivera expressly warned that "the client never sees the markups so don't ever mention markups."[22]

89.     During a February 12, 2021, meeting with DiTucci and a sales agent, Cassino explained how the sales agent made money upfront and on the back end. Cassino explained that the investor would not know about the upfront profit because "the fund pays the branch and we pay you."[23]

### 2.     *Defendants Failed to Disclose the Markups to Investors*

90.     Investors purchased their pre-IPO Securities pursuant to the Offering Documents. Regardless of  the Series Interest/Pre-IPO company at issue, the Offering Documents contained substantially the same language concerning the respective Late Stage Fund's fee structure.

91.     The PPMs for the Late Stage Funds did not disclose to investors that Defendants charged them a markup on every pre-IPO share they purchased.

92.     The PPMs for the Late Stage Funds stated that during the term of each Fund, "the Members will not be required to pay the Fund any management fee," and that Late Stage Management or its affiliate "shall bear all the expenses of the Fund."  PPMs for certain funds specified only that the investor "shall be responsible for any DTC transfer fee that may be imposed…in connection with the distribution of any Marketable Securities by the Company."

93.     The PPMs further stated that Late Stage shall not charge investors "expense Fee ('Expense Fee') or for any of the following Company expenses ('Company Expenses'):" including, *inter alia,* marketing costs, Overhead, compensation of employees and personnel, Operational Expenses, and "[a]ll expenses incurred by the Company, including out-of-pocket

---

[22] SEC Complaint ¶113.
[23] SEC Complaint ¶128.

expenses, related to the discovery, investigation, development, evaluation, structuring or negotiation of investment opportunities including, without limitation, transactions that are not consummated."

94.    The PPMs stated that Late Stage Management would receive a "carried interest" equal to twenty percent of any net profits realized by the Fund at the time the underlying pre-IPO shares or proceeds from the sales of such pre-IPO shares were distributed to investors."

95.    The carried interest was to be paid as a percentage of the pre-IPO shares only *after* the IPO. Investors therefore understood, and the PPM's represented, that Defendants would only make money after a Pre-IPO company went public and that they were purchasing Securities/Series Interests backed by pre-IPO Shares at approximately the same prices the respective Late Stage Fund paid for those shares.

96.    After prospective investors received the confidential investment letter, PPM, Late Stage Operating Agreement, and draft subscription agreement, if an investor wanted to invest in the Late Stage Fund, the investor sent back a completed subscription agreement, purchaser questionnaire, and money to Late Stage Management. Late Stage Management then sent the investor a side letter confirming the investor's acquisition of shares in a Series of a Late Stage Fund.

97.    The side letters contained substantially similar language and included the amount of the investment and the number of pre-IPO Securities the investor purchased.

98.    The manager of the Late Stage Fund and the investor both signed the side letter. Follano signed numerous side letters as manager of the Late Stage Funds.

99.    Each side letter stated that it was a "legal binding document that memorializes various terms of the [i]nvestments that are (1) not documented elsewhere; and/or (ii) may conflict

with various provisions of the limited liability company operating agreement of the [f]und."

100.   Each side letter provided that it "constitutes a valid and binding obligation of the Manager, the Fund and the Purchaser, and supersedes and actual or potentially conflicting wording in the Subscription Booklet of the Fund and the Operating Agreement."

101.   The side letters also stated that "[t]here are no fees what-so-ever attached to this investment other than the [c]arried [i]nterest documented" in the side letter.

102.   The side letters outlined the "carried interest" of profit-sharing percentage the parties agreed to, with the standard fee being twenty percent of the profit the investor realizes." Certain side letters provided for a lower fee.

103.   For example, a side letter signed by Follano dated June 26, 2019, with an investor who purchased Pre-IPO Securities advised that "[t]here are no fees what-so-ever attached to this investment other than the Carried Interest documented... above" and that "a[]ny other fees.. .shall be null and void." Similar side letters signed by Follano dated August 20, 2019, and March 3, 2021, contained the same language.[24]

104.   Similarly, Pirello and Prior2IPO and the related individuals and entities that comprised Pirrello's sales force uniformly represented that Late Stage Funds profited only by taking 20% of investors' profits when the pre-IPO companies went public and did not charge any upfront fees or commissions.

105.   For example, Prior2IPO's marketing presentations stated: "Our company Prior2IPO was created with the purpose to bring our members the best opportunities in the world without the typical fee structures of the average brokers and advisors. (WE CHARGE YOU ZERO)." Similar statements emphasizing the absence of any fees were included in social media

---

[24] SEC Complaint ¶¶69-72.

posts issued by Prior2IPO and on Prior2IPO's website.

106.    Prior2IPO's website advertised themselves as "connecting] private accredited investors to shares of the largest industry disruptors. Sometimes at discounts as much as 50% of the expected IPO." Stating that "Late Stage Investment Family of Funds" was Prior2IPO's "largest client," because "there are no upfront fees."

107.    Below is a screenshot from the now-deleted Prior2IPO website explicitly denying upfront fees or any other front end costs:[25]

### 4. Costs Of Your Membership Holdings

The Funds we work with DO NOT charge any upfront fees with this transaction, the only costs involved are charged on the back end of the membership holdings after there is some sort of liquidity event. At which time, there will be a 20% fee charged on any profitable portion of your membership holdings, after your initial principle is recouped. No other fees will be assessed.

108.    Identical claims were made on the Prior2IPO's twitter account @JoinPrior2IPO on made identical claims. On March 26, 2021, Prior2IPO's twitter account showed:

---

[25]    Still available at: https://web.archive.org/web/20220519152628/https://prior2ipo.com/the-process/



The charge

end of is which

of your initial fees

Costs Of Your Membership Holdings

Funds we work with DO NOT any upfront fees with this transaction, the only costs involved are charged on the back the membership holdings r there some sort of liquidity event. At time, there will be a 20% fee charged on any profitable portion membership holdings, after your principle is recouped. No other will be assessed.

Interested in becoming a member with us? Want more information on what we have to offer? There are a few steps that you need to take. For more information feel free to click the link below and c...

### D. Defendants Deceived Investors Concerning Pirrello's Identity

109.     Defendants knew that investors would not purchase Securities in the Late Stage Funds if they were aware of Pirrello's identity and his criminal history, which investors would readily discover had Defendants provided Pirello's real last name and identity. Despite Pirrello's critical role as founding and managing the operations of Late Stage and Prior2IPO, Defendants concealed Pirello's identity and involvement from investors by omitting his name from the Offering Documents and all Prior2IPO communications and sales material. Defendants referred to Pirrello (and Pirrello referred to himself) in all relevant documents and correspondence as "Raymond John," "Ray John," (a common technique used by fraudsters to evade internet search results), and refused to provide further information about Pirrello to investors.

110.     Defendants, including Pirello himself, admit this.

111. Pirrello's signature block on his Prior2IPO email account identified him as "Raymond John" and as the founder of Prior2IPO. He used the email address Ray@Prior2IPO.com. A version of the Prior2IPO pitch deck circulated to sales agents for soliciting investors identified Pirrello as "Our Founder Raymond John," alongside his picture. However, Pirrello was not mentioned on calls with investors and appears nowhere in the PPMs, side letters, Prior2IPO website, or Prior2IPO social media.

112. On a January 28, 2021, call with sales agents, Cassino was asked for Pirrello's last name to look up Pirrello, and Cassino replied, "[T]hat's a bad idea...he had some regulatory issues."[26]

113. Similarly, during a February 12, 2021, meeting, a potential sales agent asked Cassino and DiTucci how Pirello became the boss: "that guy Roy, Ray. I looked at him, I googled him and I'm like how.. .is this guy the boss? He looks like a.mess.I gotta worry about this guy paying me...I was a little nervous." Cassino assured the potential sales agent that he would get paid and DiTucci told him not to worry because "you're never going to hear the name Raymond ever."[27]

114. And in a meeting with a sales agent on October 21, 2021, Pirello explained why he concealed his identity: "I got in trouble back in '16 for trades that were done in '11 . . . it was an insider trading thing" and that the case "ended up going civil and I lost the civil trial. . . . [F]or me, I said you have to separate church from state and mostly it was to isolate me from the whole game, right? I figured if I was involved, and I lost my case, that it would, it would, you know, wreck the whole thing anyway, so I wanted to keep my name out of it. So, I said let's start a marketing company."[28]

---

[26] SEC Complaint ¶127.
[27] SEC Complaint ¶128.
[28] SEC Complaint ¶125.

### E.    *Defendants Knowingly Sold Unregistered Securities and Concealed this from Investors*

115.    Section 5 of the Securities Act, 15 U.S.C. § 77e, makes it unlawful for any person, directly or indirectly, to offer or sell securities, unless a registration statement is filed with the SEC and is in effect as to such offer or sale.

116.    Defendants purported to offer pre-IPO Securities through the Late Stage Funds on the basis of Rule 506(c) of Regulation D, 17 C.F.R. § 230.506(c), an SEC regulation that provides a safe-harbor registration exemption under Securities Act Section 4(a)(2) for qualifying private offerings.

117.    Indeed, the PPMs reference the use of the safe harbor provided by Rule 506(c) of Regulation D at least 18 times. In truth, Defendants were aware that no valid exemptions from registration applied given Pirrello's integral role in the Late Stage Offerings and his prior conviction for securities fraud and ban from the industry.

118.    Rule 506(d) of Regulation D provides for a "Bad Actor" disqualification that eliminates the possibility of using Rule 506(c) as a safe harbor for offering unregistered securities:

> **No exemption** under this section shall be available for a sale of securities if . . . any promoter connected with the issuer in any capacity at the time of such sale; . . . [*or] any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities; . . . : . . . (ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale*, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice: (A) In connection with the purchase or sale of any security; (B) Involving the making of any false filing with the Commission; or . . . (iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934; . . .17 C.F.R. § 230.506(d).

119.    Here, Pirello was undoubtedly a promoter and/or sales agent who profited in connection with Late Stage's sale of securities.

120.    Indeed, during a meeting on October 21, 2021, Pirrello acknowledged that "we set

the fund up," referring to himself, and his "friends" and "partners," meaning Follano and Cilano. Pirrello also acknowledged his management of the Late Stage and stated that "Prior2IPO... [is] the largest pre- IPO marketing company in the world. And we have a pretty interesting structure, ***but Late Stage Funds is us,*** so all of our business goes into the Late Stage Funds." When asked if Follano "runs for the fund for you?," Pirrello replied that Follano "runs Late Stage" and agreed that Follano "essentially works for" Pirrello.[29]

121.    In connection with his 2019 securities fraud convictions, Pirrello is subject to a Final Judgment permanently enjoining him from violations of Section 10(b) of the Exchange Act and Rule 10b-5. Pirrello is also subject to an order of the Commission entered pursuant to section 15(b) of the Exchange Act. Pirello therefore qualifies as a bad actor, which prohibits Late Stage from utilizing Rule 506(c) as a safe harbor from registration.

122.    Despite this, Defendants represented that the Late Stage Fund Offerings qualified for exemption.  Investors would not have purchased pre-IPO Securities in the Late Stage Funds had they been aware that they were illegal securities.

123.    In addition, to sell Securities in the Late Stage Funds, Defendants worked established and worked with a network of sales agents who were not licensed broker dealers or associated with registered brokerage firms.

124.    Late Stage and Prior2IPO and its branch offices, along with Pirrello, Follano, Cassino, DiTucci and Rivera were obligated to register as broker-dealers.  The Blue Sky[30] statutes of most states, including New Jersey, forbid any person from transacting business as a broker-

---

[29] SEC Complaint ¶¶132, 140, 168.

[30] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky." *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted).

dealer unless the person is registered or exempt from registration under state law.

125.    A broker-dealer is a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account. Brokerage activity is typically evidenced by persons acting as agents on behalf of others in "key points in the chain of [securities] distribution."[31]

126.    Defendants knew that the sales agents were not associated with a registered broker. For example, during a December 21, 2021, video call with sales agents, including Rivera, Pirrello warned "we should not ever represent ourselves as Late Stage" and that the fund does not have salespeople" because the sales agents were not licensed.  Pirrello acknowledge his intent, stating "we've created the largest marketing company in the world in Pre-IPO…we sell our leads. Nobody gets paid a commission. There is no pricing that is ever to be divulged to anybody in the world of what we do in terms of our marketing expenses…nobody works for commission ever. It's marketing fees."[32]

127.    Pirello and Follano met with each supervisory sales agent to discuss the procedures and business operations of Late Stage and Prior2IPO. These unlicensed and unregistered sales agents were located throughout the United States. As Pirrello stated during a meeting on October 21, 2021, to a confidential source purporting to solicit investors to purchase Securities in the Late Stage Funds referenced in the SEC's Complaint, "we have offices all over the country" and "we got 200 guys" working as sales agents.[33]

---

[31] *See, e.g., Mass. Fin. Servs., Inc. v. Sec. Inv't Prot. Corp.*, 411 F. Sup. 411, 415 (D. Mass.) *aff'd.* 545 F.2d 754 (1st Cir. 1976), cert. denied, 431 U.S. 904 (1977); *SEC v. Nat'l Exec. Planners, Ltd.,* 503 F. Supp. 1066, 1073 (M.D.N.C. 1980).
[32] SEC Complaint, ¶¶166-67.
[33] SEC Complaint ¶147.

### F.    *Defendants Failed to Deliver Investors' Shares in Triller After Triller's IPO*

128.    One of the pre-IPO companies Defendants offered shares in through the Late Stage Funds is Triller. Defendants sold private offerings through the Late Stage Funds of a then privately held company called Triller (the "Triller Series Interest"), which operated in the same manner as all the various Late Stage Funds by in investing, acquiring, holding and/or selling securities on a forward purchase contract in securities of Triller.

129.    Triller is an AI-powered music video app and talent discovery platform that purportedly allows users to create professional looking videos in seconds.

130.    Rather than becoming public through a traditional IPO, Triller completed a reverse merger with a financial services firm called AGBA, and shares of Triller Group Inc. began trading on the Nasdaq under the ticker symbol ILLR on October 15, 2024, at $5.60 per share.

131.    Pursuant to the Triller Series Interest Subscription agreements, investors who purchased pre-IPO Securities in Triller through the Late Stage Funds were entitled to demand and sell their shares by April 4, 2024, after Triller's lockup period expired.

132.    Beginning in April 2025, after the six-month lockup period, investors demanded their Triller shares from Late Stage.  Late Stage has not delivered Triller shares to investors. Triller shares are now trading at approximately $0.53/share and may become completely worthless in the near future.

133.    Late Stage has not only refused to tender the shares to investors, it has also not responded to requests for the shares cusip numbers. Investors continue to receive quarterly statements from Late Stage but are unable to access their accounts online.

**G.**    ***CSS, Halle, Green Life Farms and Earth to Energy Participated in the Fraudulent Scheme, Acted Pirrello's Agents/Alter Egos, and Knowingly Employed Unregistered Brokers to Sell Unregistered Securities***

134.    As noted herein, two of the private companies that Defendants heavily sold investors on were Green Life Farms and Earth to Energy/American Biocarbon. With relatively no publicly available information concerning either, investors were forced to rely on Defendants' representations concerning both. For example, Defendants represented that Green Life Farms' IPO was planned for the first or second quarter of 2023.

135.    Defendants heavily marked up the price of Green Life Farms and Earth to Energy. For example, on December 23, 2020, Pirello sent a text message to Cassino, Passalaqua, and Rivera stating, "Green Life New Pricing $6, cost $3." This meant the salespeople were to offer the shares at $6 per share when the true price was $3, reflecting a 100% markup.[34]

136.    On February 24, 2021, Pirrello again sent a text message to Cassino, Passalaqua, and Rivera stating that Green Life Farms should now be offered to investors at $15 per share, with a cost to Late Stage of $10. This reflected a markup of 50% and a whopping 120% price increase from two months prior.[35]

137.    While Defendants told investors that they had no affiliation with either Green Life Farms or Earth to Energy, in truth Pirrello controlled both.

138.    Green Life Farms was founded by Pirrello. Pirello held the title of "Public Relations Specialist" at Green Life Farms. Capital Truth was the largest shareholder of Green Life Farms holding over 60% of its outstanding shares. Pirrello was also a major shareholder of Green Life Farms.

---

[34] Superseding Indictment, ¶24.
[35] Superseding Indictment ¶25.

139.    Similarly, Capital Truth was the single largest shareholder of Earth to Energy. Pirello also held the title of Public Relations Specialist at Earth to Energy. Additionally, Earth to Energy's press releases directed investors to send all public relations *and investor relations* inquiries to "Raymond John Pirrello," at Ray@earthtoenergy.com.

140.    Defendants concealed this information from investors. Indeed, the Offering Documents represented:

-"The Fund is not related to Green Life Farms or any of its affiliates."

-"The Fund has no further information about Green Life Farms."

-"The Fund is not related to Earth to Energy, Inc. - Grow Power or any of its affiliates."

-"The Fund has no further information about Earth to Energy, Inc. - Grow Power."

141.    Defendant Halle, the CEO of both Green Life Farms and Earth to Energy, was closely affiliated with Pirrello and participated in the fraudulent scheme.

142.    According to Green Life Farms Rights Offering PPM, CS Solutions ("CSS," also doing business as CS Operations) manages the business and affairs of Green Life Farms with input from its Board of Directors.

143.    Halle in turn is the Executive Chaiman of CSS, and according to the PPM  is responsible for "strategic planning and overall corporate growth including assessing opportunities and developing new business."

144.    The PPM further states, "Mr. Halle is a recognized leader at raising funds through both private equity and institutional markets and has special expertise related to investments involving energy, infrastructure, and complex financing transactions."

145.    CSS is a Florida corporation that purports to provide operations, maintenance and asset management services to early-stage clean tech companies.

146.    According to CSS' website, it provides "comprehensive project management services"  to early-stage clean tech companies, as well as "opportunity evaluation," *i.e.*, "working with our partner network, we originate, evaluate, and recommend opportunities for institutional and accredited investors."

147.    Green Life Farms and Earth to Energy are two of the six companies CSS manages. A third is Burgess BioPower, a biomass power plant in Berlin, New Hampshire that filed for bankruptcy in 2024[36] and was mired in controversy having been accused of overcharging rate payers for electricity.

148.    According to Pirrello's various online biographies, in addition to working with Halle/CSS to raise investor funds for Green Life Farms and Earth to Energy,  he was also involved in "raising funds" for Burgess BioPower.

149.    Indeed, Pirello's (presumably self-authored) online biography states that Pirrello: "embraced a green mantra…His trailblazing spirits is vivid in endeavors such as American BioCarbon…His guardianship of Earth to Energy Fund is a testament to his ability to marry visionary pursuits with tangible dividends."[37] Other online profiles of Pirrello state, "Raymond played a seminal role in crafting the narrative of Greenlife Farms."[38]  And, "[h]e showcased his adaptability as a pioneering force behind Greenlife Farms in Florida, from laying its foundation as a co-founder to spearheading its public relations.[39]"

150.    Pirrello heavily solicited investors to purchase shares in Green Life Farms in his capacity as public relations specialist and head of investor relations at Green Life Farms, sending

---

[36] Case No. 24-10235 (LSS), (Bankr. D. Del.)
[37]https://speakerhub.com/speaker/raymond-pirrello
[38] https://form.jotform.com/232827279469068
[39] https://www.behance.net/raymondpirrell?locale=en_US

investors emails from his Green Life Farms email address "ray@greenlifefarms.ag."

151.    Upon information and belief, Pirello, Follano, and Halle participated in calls with investors in Green Life Farms and Earth to Energy during which they solicited investments in those companies through the Late Stage Funds.

152.    Beginning in January 2023, Pirrello, in his public relations capacity at Green Life Farms, along with CSS and Halle, solicited investors to invest in a "rights offering" for Green Life Farms at a price of $28 per share.

153.    The February 27, 2023, Green Life Farms Rights Offering Private Placement Memorandum offered up to 3,621,983 units of Green Life Farms at a price of $28 per unit with a closing date of March 31, 2023, to existing Green Life Farms shareholders, for a maximum offering of $101,415,524.

154.    In a February 28, 2023, email from Pirrello, which he sent from his Green Life Farms email address, Pirrello wrote to investors: "As we finalize this next phase of growth with GreenLife Farms we will close out the rights offering at end of quarter. Since the beginning of this offering, our store counts have increased from 277 to over 1130. We are now positioned to begin the next phase of our business plan which entails key acquisitions and construction starts across our fully owned land throughout Florida. Green Life Farms product is now available in stores located across four states Florida, Alabama, Louisiana, Georgia."

155.    Pirrello instructed investors to login to see their Rights offering for Green Life Farms with "your credentials from your [L]ate [S]tage portal."

156.    CS Solutions, Halle, Green Life Farms and Earth to Energy concealed Pirrello's true identity given his securities fraud conviction and ban from the industry, passing him off instead as "Raymond John."  In so doing, they created the false appearance that Pirrello was a

legitimate business person working in investor relations for Green Life Farms and Earth to Energy.

157.   It is beyond doubt that CS Solutions, Halle, Green Life Farms, and Earth to Energy were aware of, or at the very least reckless in not discovering, Pirrello's criminal history, as a simple internet search would have readily revealed it.

158.   CSS also directly solicited investors to purchase shares in Earth to Energy through Late Stage, disseminating the misleading statements and omissions the other Defendants authored. For example, an email from an employee in "business development" at CSS sent to an investor solicited an investment in Earth to Energy through Late Stage, writing "(Below is a copy/paste from the Fund manager)":

> Thank you for your previous investment into American Biocarbon (ABC), via Earth to Energy through Late State. As you may know, CS Operations, Inc. (CSO) provides Operations, Maintenance, and Management services to ABC. CSO has a successful track record in ownership and operation of a variety of clean-tech and renewable energy companies, including in the energy generation, solar, hydroponics, and ag-waste recycling industries.
>
> […]
>
> However, ABC needs your support to achieve financial close by September 2024 and start construction. We need $5 million to get to the finish line. **I would like to present an excellent investment opportunity to interested investors looking to average down the shares you purchased through Late Stage at $20 or $25 to $5 per share.**
>
> This is a unique opportunity to both enable the immediate forward progress of the company and generate significant income at a high rate of return to you. Interested investors should contact me as soon as possible and book a 30-minute detailed overview of the opportunity.
>
> Thank you for your consideration, and I look forward to speaking soon.
>
> Eart2Energy/American BioCarbon (Investment Opportunity at $5)
> Pilot plant successfully running at Sugar Mill
> $111 mil debt offering term sheet complete, money will be used for the commercial plant construction
> $120 CORC contract signed by a Fortune 100 company
> After Bond offering Valuation is $500 million

Certified by Puro.Earth
Plan to sell in the future at a $1 Billion valuation

(emphasis in original)

159.    The above email evidence that CSS and Halle were aware that the Earth to Energy shares offered through Late Stage were marked up, as it references an initial purchase price "through Late Stage at $20 or $25." Because Defendants marked up all of the shares offered through the Late Stage Funds the shares investors purchased for "$20 or $25" likewise reflected a markup up price.

160.    The foregoing facts demonstrate that an agency relationship between Pirello on the one hand, and CSS, Halle, Green Life Farms and Earth to Energy on the other, exists.

161.    Pirrello controlled the fraudulently obtained investments through his dual roles at Late Stage/Prior 2 IPO and CSS, Green Life Farms, and Earth to Energy. CSS, Green Life Farms, Halle and Earth to Energy acted at Pirrello's behest in soliciting investments in Green Life and Earth to Energy through the Late Stage Funds. Further, they acted as one integrated entity in obtaining investments in Green Life Farms and Earth to Energy.

162.    Further, as discussed herein, none of the Defendants nor any of the sales agents they recruited to sell securities for the Late Stage Funds were associated with a registered broker at the time of those sales. Green Life Farms, Earth to Energy, (through their management company CSS) were issuers of the shares in these companies and, employed Pirrello and Prior2IPO as their sales agents to offer Green Life Farms and Earth to Energy Securities in the Late Stage Funds despite knowing that they were not registered or employed with any registered broker-dealer and operated a massive sales force of approximately 200 sales agents who were not registered with any broker-dealer, at various locations across the United States.

**The SEC Complaint and Criminal Indictment Expose Defendants' Fraud**

163.    On December 5, 2023, Pirrello was indicted and charged with conspiracy to commit securities fraud, conspiracy to commit wire fraud, and securities fraud. His bail was set at $2 million.

164.    The next day, the SEC filed the SEC Complaint against: Pirrello, Follano, Cassino, DiTucci, Rivera, Prior2IPO, Late Stage, Pre-IPO Marketing and JLRE, alleging Defendants violated, *inter alia*, Section 17(a) of the Securities Act, Sections 10(b)(5) and 15 of the Exchange Act and Section 5(a) and (c) of the Securities Act. The Securities Complaint described how "Defendants used a network of unregistered sales agents to engage in unregistered offerings of securities in investment vehicles that provided access to shares of private companies that may hold an initial public offering. But, Defendants procured investor fund by fraud, falsely telling investors that Defendants would only make money when investors made money" but in truth "charged exorbitant upfront markups on all investments allowing Defendants to pocket millions of dollars before investors made a time." SEC Complaint ¶1.  The SEC Complaint described the fraudulent scheme, Defendants' illegal sale of unregistered securities, and Defendants' intentional concealment of Pirrello's identity and pivotal role in the Late Stage Funds. The Court stayed the SEC Action pending the resolution of the Criminal Action.

165.    On February 10, 2025, the Superseding Indictment issued. The Court unsealed the Superseding Indictment on February 13, 2025. The Superseding Indictment charged Pirrello, Cassino, Passalaqua, and Rivera. While it did not formally charge Late Stage and Follano, or Truth Capital and Cilano, it described Follano and Cilano as co-conspirators who "dictated the pitch language that was used by employees at Prior2IPO to market investments in Late Stage."[40]

---

[40] Superseding Indictment ¶20.

166.    Trial in the Criminal Action is set to begin on April 6, 2026.

## V.    CLASS ALLEGATIONS

167.    Plaintiffs bring this action, individually, and on behalf of a nationwide class, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

168.    All persons who, during the Class Period, purchased Securities through the Late Stage Funds and were subsequently damaged thereby.

169.    The Class Period is defined as the period between March 1, 2019, and December 6, 2023.[41]

170.    Excluded from the Class are: (a) all Defendants and all present or former officers, directors, and employees of Defendants and such excluded persons' affiliates subsidiaries, members of such excluded persons' immediate families and their legal representatives, heirs, successors or assigns and (b) any entity that any Defendant or any excluded person under (a) controlled or has or had a material ownership interest in. Also excluded from the Class is any person who timely and validly requests exclusion from the Class.

171.    **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class is currently unknown, such information being in the sole possession of Late Stage and other Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe that the Class consists of thousands of people. According to the SEC Complaint, between March 2019 to July 2022, Defendants raised approximately $528 million from more than 4,000 investors across the country and internationally. SEC Complaint ¶2. The number of Class members can be

---

[41] Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

determined based on third party records.

172.    **Commonality**: Common questions of law and fact exist as to all members of the Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a)  whether Defendants employed a device, scheme, or artifice to defraud and/or engaged in any act, practice, or course of business that operated or would operate as a fraud or deceit upon Plaintiffs and the Class on which Plaintiffs and the Class relied;

b)  whether the Offering Documents contained materially misleading statements and/or omissions.

c)  whether Defendants' fraudulent schemes, actions, course of business conduct, and materially misleading statements and omissions caused loss to Plaintiffs and the Class;

d)  whether Plaintiffs and Class members have suffered damages, and, if so, the nature and extent of those damages.

173.    **Typicality:** Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and the Class members' claims all arise out of Late Stage's uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of securities in the Late Stage Funds.

174.    **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex securities class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

175. **Predominance**: Questions of law or fact common to class members predominate over any questions affecting only individual members of the Class. Specifically, the foundation of the Late Stage Funds was that they provided Plaintiffs with the opportunity to lawfully purchase shares in pre-IPO companies at the same prices as Late Stage acquired them, and with a 20% carried interest being deducted only in the event of an IPO or liquidity event. All investors in securities in the Late Stage Funds, therefore, relied on the fact that the price they paid for the underlying security represented the actual price of the security. In addition, as a result of their participation and control over the scheme to defraud, Defendants received a material pecuniary benefit in the form of the undisclosed markups, *i.e,* the difference between what they paid for the pre-IPO security and the price at which they sold the security to investors through the Late Stage Funds. As such, Defendants were duty bound to disclose, but omitted, to disclose the mark-up, that the securities offered were illegal unregistered securities and that the man spearheading the Securities Offerings was a convicted fraudster. Accordingly, Defendants' omissions are actionable and the reliance presumption in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) applies.

176. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for individual Class members to effectively redress the wrongs done to them. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system, because of the complex legal and factual issues of this case. Individualized rulings and judgments

could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I – STATEMENT LIABILITY
### Violations of Section 10(b) of the Securities Exchange Act
### And SEC Rule 10b-5(b)
### (Against Defendants Pirrello, Follano, Late Stage, Prior2IPO, Pre-IPO Marketing, JLRE, Rivera, DiTucci, Passalaqua, and Cassino))

177.    Plaintiffs repeat and reallege all preceding allegations above as if fully set forth herein.

178.    Plaintiffs bring this claim for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

179.    Plaintiffs bring this claim on behalf of all Class members who purchased Securities in the Late Stage Funds during the Class Period.

180.    The Series Interests/Securities in the Late Stage Funds are securities within the meaning of §2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1), and were sold to Plaintiffs and the other Class members.

181.    Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of any security, "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

182.    In connection with the sale of Securities in the Late Stage Funds, Defendants disseminated, approved, and/or endorsed the false statements described herein, which these

Defendants knew or recklessly should have known were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially misleading.

183.    Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially high prices for pre-IPO Securities in the Late Stage Funds, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**Misrepresentations and Omissions**

184.    Defendants' untrue statements and omissions of material facts in connection with the sale of securities in the Late Stage Funds include at least the following.

185.     Between approximately March 1, 2019 and December 1, 2023 Defendants offered and solicited investors to purchase shares in the various Late Stage Funds, of which there were approximately 50 using: 1) a general series investment letter describing the pre-IPO company the investor was purchasing shares in, 2) a private placement memorandum ("PPM") describing the terms of the offering, a copy of Late Stage's operating agreement, and a subscription booklet ("Offering Documents"). Regardless of the Series Interest/pre-IPO company at issue, the Offering Documents contained substantially the same language and identical material terms. Pirrello and Follano drafted the Offering Documents.  Pirrello, Follano, Rivera, DiTucci, Passalaqua, and Cassino disseminated and instructed their respective sales personnel at Pre-IPO Marketing to disseminate the Offering Documents to Investors.

186.    The PPMs stated that during the term of each Fund, "the Members will not be required to pay the Fund any management fee," and that Late Stage Management or its affiliate "shall bear all the expenses of the Fund."  PPMs for certain funds specified only that the investor "shall be responsible for any DTC transfer fee that may be imposed…in connection with the distribution of any Marketable Securities by the Company."

187.    The PPMs further stated that Late Stage shall not charge investors "expense Fee ('Expense Fee') or for any of the following Company expenses ('Company Expenses'):" including, *inter alia,* marketing costs, Overhead, compensation of employees and personnel, Operational Expenses, and "[a]ll expenses incurred by the Company, including out-of-pocket expenses, related to the discovery, investigation, development, evaluation, structuring or negotiation of investment opportunities including, without limitation, transactions that are not consummated."

188.    The PPMs stated that Late Stage Management would receive a "carried interest" equal to twenty percent of any net profits realized by the Fund at the time the underlying pre-IPO shares or proceeds from the sales of such pre-IPO shares were distributed to investors."

189.    The foregoing statements were materially misleading because the Offering Documents omitted to disclose that Defendants always charged investors a substantial markup for the shares purchased through the Late Stage Funds, and that the offering price for the shares investors purchased through the Late Stage Funds was not the security's true price, but was inflated by as much as 50% due to the undisclosed markup.

190.    The Offering Documents represented that shares in the Late Stage Funds were being offered pursuant to a safe harbor exemption under Rule 506(c) of Regulation D, which exempts certain offerings from the registration requirements, as discussed in IV. E, *supra*. The

Class Period PPMs make at least 18 references to the use of the safe harbor provided by Rule 506(c). For example, the PPM's each represented in capital letters "THE INTERESTS ARE BEING OFFERED IN RELIANCE ON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND ARE NOT REQUIRED TO COMPLY WITH THE SPECIFIC DISCLOSURE REQUIREMENTS THAT APPLY TO REGISTRATION UNDER THE 1933 ACT." The foregoing statements are materially misleading because Defendants omitted to disclose that sales of shares in the Late Stage Funds did not qualify for a safe-harbor exemption because of Pirrello's role, including as a key promoter behind soliciting investors in these securities offerings after September 23, 2019, when he was barred from association with, among other entities, any broker, dealer or investment adviser and was deemed a "bad actor" under Rule 506(d) for purposes of Rule 506(b) and (c) [17 C.F.R. §230.506(d)(1)(vi)].

191.    The PPMs generally described the "investment professionals of the Manager (the 'Management Team')" as "active in investing in various private companies over the last several years, including companies engaged in social media, digital media, and other technology businesses." Nowhere did the Offering Documents reference Raymond Pirrello's key role in the "Opportunities" offered through the Late Stage Funds, or his criminal history.

192.    Defendants' omission of Pirrello's identity and role in the Offerings renders the statements in the Offering Documents materially incomplete because investors would not have purchased shares in the Late Stage Funds had they known of Pirrello's role given his convictions and history of securities fraud.

193.    Throughout the Class Period Defendants offered investors shares of Green Life Farms through one of the Late Stage Funds, Late Stage Investment Fund VII LLC. The "confidential letter" sent to investors in the Late Stage Fund offering Green Life Farms shares

specified that the Fund's manager is Capital Truth Advisors, LLC. Marcello Follano, signed the Subscription Agreement as "Capital Truth Advisors, Manager." The Subscription Agreement for Late Stage Investment Fund VII LLC stated that the Fund "has no further information" about Green Life Farms. The Offering Documents additionally stated, "The Fund is not related to Green Life Farms or any of its affiliates."

194.    The foregoing statements were materially misleading because the Offering Documents omitted to disclose that Pirrello was the founder, "public relations specialist," and major shareholder of Green Life Farms, and had teamed up with Halle as CS Solutions to raise capital for Green Life Farms, Earth to Energy and Burgess Power, and that Capital Truth held 60% of the shares of Green Life Farms.

195.    The Offering Documents issued in connection with the Late Stage Funds offerings of shares in Earth to Energy/American Biocarbon similarly stated The Fund is not related to Earth to Energy, Inc. - Grow Power or any of its affiliates" and "The Fund has no further information about Earth to Energy, Inc. - Grow Power."

196.    The foregoing statements were materially misleading because the Offering Documents omitted to disclose that Pirrello was the head of Investor Relations at Earth to Energy and had teamed up with Halle as CS Solutions to raise capital for Green Life Farms, Earth to Energy and Burgess Power.

### Defendants' False Statements and Omissions Were Material

197.    The foregoing misrepresentations and omissions were each material

198.    These misrepresentations related to: (i) the price of the shares investors purchased, (ii) the legality of investors' investments, and (iii) the role of a convicted fraudster in structuring and offering the investments.

47

199.    First, information regarding the price of the pre-IPO shares and undisclosed markup affects the return investors would receive if and when the pre-IPO company ever went public. For example, Marqueta and Instacart, two pre-IPO companies the Late Stage Funds offered pre-IPO Securities in in did go public. Second, Pirello's involvement with both Late Stage and Green Life Farms and Earth to Energy is highly material. Knowing that they were: 1) buying shares in a private company that is closely related to both the insiders selling them the interest and 2) that an individual with a history of securities fraud banned from the industry structed and arranged the Offerings would alter the total mix of information for a reasonable investor. Third, Defendants' omission of the fact that investors were purchasing illegal, unregistered securities is highly material, as no reasonable investor would invest money in an illegal security.

**Reliance, Economic Loss and Loss Causation**

200.    As a result of Defendants' publication and dissemination of the materially misleading information and omission of material facts, Defendants' fraudulent scheme, and illegal sale of unregistered securities, the price of the securities investors purchased through the Late Stage Funds was artificially inflated.

201.    In reliance on the fact that they were purchasing pre-IPO Securities through the Late Stage Funds at the same price Late Stage had acquired the shares, and would be charged only a 20% carried interest if and when the pre-IPO company went public or had a liquidity event, investors purchased Securities in the Late Stage Funds. Further relying on the absence of material adverse information, *i.e.,* that the securities offered in the Late Stage Funds were illegal unregistered securities and that the individual responsible for orchestrating the illegal offerings was a convicted securities fraudster, Plaintiffs and the other Class Members acquired Securities in the Late Stage Funds at artificially high prices and were damaged thereby.

202.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class Members suffered damages in connection with the respective purchases of Securities in the Late Stage Funds and are entitled to an award compensating them for such damages.

203.    In addition, as a direct and proximate result of Defendants' wrongful conduct, Defendants have generated and retained ill-gotten gains in connection with the undisclosed markups of all shares sold through the Late Stage Funds and are entitled to disgorgement of Defendants' ill-gotten gains from such misconduct.

### COUNT II – SCHEME LIABILITY
**Violations of Section 10(b) of the Securities Exchange Act
And Rule 10b-5(a) and (c) Promulgated Thereunder
(Against All Defendants)**

204.    Plaintiffs repeat and reallege each and every single allegation contained above as if fully set forth herein.

205.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5(a) and (c) promulgated thereunder.

206.    During the Class Period, Defendants, individually and in concert with others, directly or indirectly, employed devices, schemes and artifices to defraud and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of securities in the Late Stage Funds during the Class Period

207.    Critical to the sale of securities in the Late Stage Funds was that investors were purchasing shares in pre-IPO securities that qualified for exemption from registration at prices which reflected their true value at the time they were purchased. Instead, Defendants sold and

49

marketed unregistered securities at marked-up prices and pocketed the mark-up. Defendants also concealed from investors the identity of Pirrello- the head of the Late Stage Funds' affiliated salesforce who was barred by the SEC from the securities industry. Defendants' illegal sales of unregistered securities at consistently marked up prices, constituted acts, practices, device, scheme, artifice, and/or course of business that operated as a fraud or deceit upon Plaintiffs and members of the Class.

208.    Defendants acted with scienter in that they knew or were severely reckless in not knowing that: (a) the securities sold were marked up and Defendants pocketed the illegal markups, (b) the securities were illegal unregistered securities because Pirrello was a bad actor and no exemption from registration applied and (c) Pirrello was a convicted securities fraudster barred from the industry. By virtue of their knowledge or severely reckless disregard of the foregoing their misconduct evidences an intent to defraud investors.

209.    As a result of the foregoing, the prices of Securities in the Late Stage Funds were artificially inflated during the Class Period. In ignorance of Defendants' acts, practices, device, scheme, artifice, and course of business, Plaintiffs and the Class purchased Securities in the Late Stage Funds at prices that were artificially inflated as a result of Defendants' violation of SEC Rule 10b-5(a) and (c). Defendants participated in an intentional scheme—selling unregistered securities at marked up prices—for the purpose of enriching themselves. Through their scheme to defraud, Defendants received a large pecuniary benefit.

210.    In reliance on the fact that the Securities in the Late Stage Funds offered investors a chance to purchase pre-IPO securities for their actual price through a reputable investment vehicle many investors purchased securities in more than one of the Late Stage Funds. Further relying on the absence of Defendants' scheme or artifice to defraud about which Defendants knew

or severely recklessly disregarded and omitted, Plaintiffs and the Class acquired Late Stage Securities at artificially high prices and were damaged thereby. Had Plaintiffs and the other members of the Class been aware that Defendants marked up all of the securities and that the securities were in fact illegal offerings orchestrated by a convicted securities fraudster they would not have purchased the Late Stage Securities at all.

211. As a direct and proximate result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

212. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and SEC Rule 10b-5(a) and (c) promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of securities in the Late Stage Funds during the Class Period.

## COUNT III - CONTROL PERSON LIABILITY
**(Against Defendants Pirrello, Follano, Passalaqua, Cassino, DiTucci, Cilano and Halle the Control Defendants for Violations of Section 20(a) of the Exchange Act)**

213. Plaintiffs repeat and reallege all preceding allegations above as if fully set forth herein.

214. This Count is asserted against Defendants Pirrello, Follano, Passalaqua, Cassino, DiTucci, Cilano, and Halle.

215. Defendant Pirrello was the founder, owner, and controller of Prior2IPO. Defendant Pirrello was also the founder of and major owner of Green Life Farms, and head of public relations at Green Life Farms. Defendant Pirrello was also a major owner and head of investor relations at Earth to Energy. By virtue of his high-level positions, participation in, and/or awareness of the operations of, and his power to control public statements by Prior2IPO, Green Life Farms and Earth to Energy, Individual Defendant Pirrello had the power and ability to control the actions of

51

Prior2IPO, Green Life Farms and Earth to Energy and its employees. By reason of such conduct, Individual Defendant Pirrello is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Prior2IPO, Green Life Farms and Earth to Energy.

216.    Defendant Passalaqua is the CEO of Prior2IPO. By virtue of his high-level position, participation in, and/or awareness of the company's operations, direct involvement in the day-to-day operations of the company, and/or intimate knowledge of the company's actual performance, and his power to control public statements by the company, Defendant Passalaqua had the power and ability to control the actions of Late Stage and its employees. By reason of such conduct, Defendant Passalaqua is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Prior2IPO.

217.    Defendant Follano was the founder, Managing Partner, and President of Late Stage. By virtue of his high-level position, participation in, and/or awareness of the company's operations, direct involvement in the day-to-day operations of the company, and/or intimate knowledge of the company's actual performance, and his power to control public statements by the company, Defendant Follano had the power and ability to control the actions of Late Stage and its employees. By reason of such conduct, Individual Defendant Follano is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Late Stage.

218.    Defendant Cilano was the President, Sole Authorized Person and Managing Member of Capital Truth. By virtue of his high-level position, participation in, and/or awareness of the company's operations, direct involvement in the day-to-day operations of the company, and/or intimate knowledge of the company's actual performance, and his power to control public statements by the company, Defendant Cilano had the power and ability to control the actions of Capital Truth and its employees. By reason of such conduct, Individual Defendant Cilano is liable

pursuant to Section 20(a) of the Exchange Act for the violations committed by Capital Truth.

219.    Defendants Cassino and Ditucci were the co-owners of Pre IPO Marketing. By virtue of their high-level positions, participation in, and/or awareness of the company's operations, direct involvement in the day-to-day operations of the company, and/or intimate knowledge of the company's actual performance, and their power to control public statements by the company, Individual Defendants Cassino and Ditucci had the power and ability to control the actions of Pre IPO Marketing and its employees. By reason of such conduct, Defendants Cassino and Ditucci are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Pre IPO Marketing.

220.    Defendant Rivera was the owner of JLRE. By virtue of his high-level position, participation in, and/or awareness of the company's operations, direct involvement in the day-to-day operations of the company, and/or intimate knowledge of the company's actual performance, and his power to control public statements by the company, Individual Defendant Rivera had the power and ability to control the actions of JLRE and its employees. By reason of such conduct, Individual Defendant Rivera is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by JLRE.

221.    Defendant Halle is the Chairman and CEO of Green Life Farms and Earth to Energy and the managing member of CS Solutions. By virtue of his high-level position, participation in, and/or awareness of the companies' operations, direct involvement in the day-to-day operations of the companies, and/or intimate knowledge of the companies' actual performance, and his power to control public statements by the companies, Individual Defendant Halle had the power and ability to control the actions of Green Life Farms, Earth to Energy, CS Solutions and its employees. By reason of such conduct, Defendant Halle is liable pursuant to

Section 20(a) of the Exchange Act for the violations committed by Green Life Farms, Earth to Energy and CS Solutions.

### COUNT IV – SELLING UNREGISTERED SECURITIES
**Violations of Sections 5 and 12(a)(1) of the Securities Act**
**(Against Defendants Pirrello, Follano, Passalaqua, Cassino, Rivera, DiTucci, Late Stage, Prior2IPO, Pre-IPO Marketing and JLRE)**

222.    Plaintiffs repeat and reallege all preceding allegations above as if fully set forth herein. incorporates each and every allegation above as if fully set forth herein.

223.    Section 12(a)(1) of the Securities Act provides an express private right for investors to bring civil actions against sellers who violate Section 5 of the Exchange Act: "Any person who [] offers or sells a security in violation of Section 77e of this title . . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77l(a).

224.    Section 5 of the Securities Act makes it unlawful for any person, directly or indirectly, to offer or sell securities, unless a registration statement is filed with the Commission and is in effect as to such offer or sale: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2)to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e

225.    Rule 506 of Regulation D provides exemptions for limited offers and sales of unregistered securities: "Exemption. Offers and sales of securities by an issuer that satisfy the

conditions in paragraph (b) or (c) of this section shall be deemed to be transactions not involving any public offering within the meaning of section 4(a)(2) of the Act." 17 CFR § 230.506(a).

226.    However, Rule 506(d) provides for a "Bad Actor" disqualification that eliminates the possibility of using a Rule 506 exemption as a safe harbor for offering unregistered securities. As set forth herein, Pirrello is a "bad actor" under the statute given his 2019 securities fraud conviction and SEC Order barring him from the industry and is sufficiently involved in Late Stage and the promotion and sale of securities in the Late Stage Funds for the Bad Actor disqualification to apply to Late Stage.

227.    Accordingly, Rule 506(d) applies and the Rule 506(c) exemption utilized by Late Stage is statutorily prohibited, meaning that PPMs and side letters entered into between the investors and Late Stage are illegal, unregistered securities offerings in violation of Section 5 of the Securities Act.

228.    Each of the Offering Defendants is a seller under the meaning of Section 12(a)(1) because they either signed the PPMs on behalf of Late Stage or solicited investors to invest in Late Stage securities that violated Section 5 in exchange for personal gain. Indeed, the Offering Defendants made millions of dollars in commissions from Late Stage.

229.    By virtue of the conduct alleged herein, these Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered.

### COUNT V
### Violations of Section 15 of the Securities Act
### (Against Defendants Pirrello, Follano, Rivera, DiTucci, Cassino and Passalaqua)

230.    Plaintiffs repeat and reallege all preceding allegations above as if fully set forth herein.

231.    This Count is asserted against Defendants Pirrello, Follano, Rivera, DiTucci, Cassino and Passalaqua under §15 of the Securities Act, 15 U.S.C. §77o.

232.    The Defendants named in this count, by virtue of their offices, ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of §15 of the Securities Act. By controlling the Defendants' violation of the Securities Act as set forth in the prior Count, these Defendants had the power and influence and exercised the same to cause the unlawful offer and sale of securities in the Late Stage Funds as described herein.

233.    The Defendants named in this count Defendants had the power to direct or cause the direction of the management and policies of Defendants through ownership of voting securities, by contract, subscription agreement, or otherwise, and accordingly are liable for Defendants' violations of the Securities Act.

234.    By virtue of the conduct alleged herein, Defendants named in this count are liable for the wrongful conduct complained of herein and is liable to Plaintiffs and the Class for rescission and/or damages suffered.

### COUNT VI- NEW JERSEY STATE LAW-
### Violations of the New Jersey Uniform Securities Act (N.J.S.A. 49:3-71(a)
### (Against All Defendants)

235.    Plaintiffs repeat and reallege all preceding allegations as if fully set forth herein.

236.    Title 49, Chapter 3, Section 71 of the New Jersey Uniform Securities Act makes is unlawful for any person to offer or sell (2) "a security by means of any untrue statement of material fact or any omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading…" or "(3) offers, sells or purchases a security by employing any device, scheme, or artifice to defraud…" or (4) offers, sells

56

or purchases a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person…" or "(5) engages in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities (i) in willful violation of this act or of any rule or order promulgated pursuant to this act, or (ii) employs any device, scheme or artifice to defraud the other person or engages in any act, practice or course of business or conduct which operates or would operate as a fraud or deceit on the other person."

237. For the reasons set forth in Counts I and II herein, Defendants violated subsections 2-5 of N.J.S.A. 49:3-71(a).

238. During the Class Period, Defendants issued false and misleading statements to Late Stage investors in connection with the sale of Pre-IPO shares during the Class Period which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

239. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in this Complaint, or recklessly disregarded the true facts that were available to them.

240. Plaintiffs and the Class reasonably relied upon the numerous representations that they would not pay any up front fees with their investment, that Late Stage was paying the same price for the securities as the investors, that Pre-IPO companies were unaffiliated with Late Stage, and that their investments were legal securities offerings.

241.    Defendants engaged in a scheme to defraud investors by selling unregistered securities that were marked up and did not reflect their true prices.

242.    Defendants advised investors as to the value of the securities, leading investors to believe they were purchasing shares at the same prices at which Defendants acquired them.

243.    By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered. N.J.S.A. 49:71(3)(c).

### COUNT VII -NEW JERSEY STATE LAW -TRANSACTING BUSINESS AS AN UNLICENSED BROKER-DEALER
### N.J.S.A. 49:3-56; 49:3-71(c)
### (Against Late Stage, Prior2IPO, Pirrello, Passalaqua, and Follano)

244.    The New Jersey Uniform Securities Act makes it unlawful for any person to act as a broker-dealer, agent, investment adviser or investment adviser representative or Internet site operator unless that person is registered or exempt from registration. N.J.S.A. 49:3-56; N.J.S.A. 49:3-71(c)

245.    Defendants named in this count transacted business as broker-dealers in New Jersey, including without limitation through solicitations directed by them to New Jersey and received in New Jersey.

246.    Defendants named in this count were not registered as broker-dealers nor were they subject to any exemptions from licensing.

247.    By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered. N.J.S.A. 49:71(3)(c).

**COUNT VIII NEW JERSEY STATE LAW- EMPLOYING UNREGISTERED**
**SALES AGENTS**
**(N.J.S.A. 49:3-56(h); N.J.S.A. 49:3-71(c)**
**(Against Green Life Farms, Earth to Energy, CSS and Halle))**

248.    The New Jersey Uniform Securities Act makes it unlawful for any broker-dealer *or issuer* to employ an agent in this State unless the agent is registered (N.J.U.S.A. 49:3-56(h)).

249.    Green Life Farms, Earth to Energy, CSS, and Halle were issuers of securities in Green Life Farms and Earth to Energy and employed Pirrello and Prior2IPO to act as agents in New Jersey to solicit Class Members to purchase securities in Green Life Farms and Earth to Energy through the Late Stage Funds knowing that they were not registered with any broker and knowing that they did not qualify for any exemptions from registration.

250.    By virtue of the conduct alleged herein, Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages suffered. N.J.S.A. 49:71(3)(c).

**COUNT IX**
**Breach of Contract**
**Against Late Stage and Follano**

251.    Plaintiffs repeat and reallege all preceding allegations as if fully set forth herein.

252.    This claim is brought on behalf of investors who purchased Triller securities in the Late Stage Funds.

253.    Late Stage offered pre-IPO shares of Triller through the Late Stage Funds. As with all securities in the Late Stage Funds, investors signed a subscription agreement and tendered payment to Late Stage in order to secure their investments in the Late Stage Funds. The subscription agreement was countersigned by Late Stage. Follano countersigned the subscription agreements in connection with the Late Stage's sale of Triller securities in the Late Stage Funds.

254.    Investors fully complied with their obligations under the Subscription Agreement

59

by making payment to Late Stage, signing the agreement and submitting the required paperwork establishing their status as accredited investors.

255.    Triller completed a reverse merger with ABGA, a financial services firm and began trading on the NASDAQ under ticker symbol "ILLR" on October 15, 2024, at a price of $5.60 per share.

256.    Pursuant to the Subscription agreements, investors who purchased interests in Triller through the Late Stage Funds were entitled to demand and sell their shares by April 4, 2024, 185 days after Triller's IPO and the expiration of the lock-up period.

257.    Pursuant to the terms of the Subscription Agreement and the Offering Documents for Triller securities in the Late Stage Funds, investors demanded their Triller shares from Late Stage subsequent to the expiration of the lock-up period.

258.    Late Stage breached the Triller Subscription Agreement by failing to deliver Triller shares to Late Stage investors. Late Stage has also ignored investors' requests for the CUSIP numbers associated with such shares calling into question whether the shares were purchased in the first instance.

259.    Triller shares are now trading at approximately $0.53 per share and may become worthless in the near future.

260.    Class Members who purchased Triller securities in the Late Stage Funds have been damaged as a result of Defendants' breaches.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more of the Classes defined above;

B.      Appoint Plaintiffs as representatives of the Class and The Rosen Law Firm, P.A., as Class counsel;

C.      Award all actual, general, special, incidental, statutory, rescission, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

D.      Award post-judgment interest on such monetary relief;

E.      Award reasonable attorneys' fees and costs; and

F.      Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, individually and on behalf of the putative Class, demand a trial by jury on all issues so triable.

Dated: September 26, 2025                      Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Sara Fuks*
Sara Fuks
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
sfuks@rosenlegal.com

*Lead Counsel for Plaintiffs*

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com

*Additional Counsel for Plaintiffs*