# GUSRAE KAPLAN NUSBAUM PLLC

ATTORNEYS AT LAW

RICHARD DEVITA
TIMOTHY FEIL
SCOTT H. GOLDSTEIN
MARTIN H. KAPLAN
PAUL A. LIEBERMAN
LAWRENCE G. NUSBAUM

29 BROADWAY, SUITE 1200
MAILING – SUITE 1100
NEW YORK, NEW YORK 10006

170 MONTAUK HIGHWAY, SUITE 4
SPEONK, NEW YORK 11972

OF COUNSEL
ROBERT L. BLESSEY

TEL (212) 269-1400

www.gusraekaplan.com

July 27, 2026

**Via ECF**
The Honorable Kiyo A. Matsumoto
United States District Judge for the Eastern District of New York
225 Cadman Plaza East, Courtroom 6B
Brooklyn, New York 11201

> Re:   *Evangelista et al. v. Late Stage Asset Management et al.*
> Civil Action No. 24-cv-5292

Dear Judge Matsumoto:

As per your Honor's direction, we write on behalf of our clients Joshua Cilano and Capital Truth Holdings, Ltd. (a Bahamian entity, "CTH Ltd.").

Preliminarily, we note that as is more fully set forth below and in a separate submission to the Court, the Declaration of Ravindra Pumagame (ECF No.115-1, reattached hereto for convenience as Ex. D) has intentionally omitted a July 9, 2026 specific email communication from Late Stage (Ex. F) to Mr. Pumagame, emailed to the same address he received the initial notice, the July 9, 2026 email notice (Ex. D) stated that "No Funding of the Sale of SpaceX has occurred ….."

Clearly, Mr. Pumagame received the communication by email from Late Stage see attached, to his Declaration (Ex. D) and presumptively he received the July 9, 2026 email (Ex. F).

The contention by Plaintiff's counsel of no communications from Late Stage of the status of the subject transaction is false and misleading (see Ex. F), as is more fully set forth below.

**Initial Observations**

We respectfully note, in the interest of clarity that neither Mr. Cilano, nor CTH Ltd., nor Capital Truth Holdings Ltd. SAC-1 ("SAC-1"), nor to their knowledge neither Late Stage, nor Mr.

GUSRAE KAPLAN NUSBAUM PLLC

The Honorable Kiyo A. Matsumoto
United States District Judge for the Eastern District of New York
July 27, 2026
Page 2 of 6

Follano, have received any consideration directly or indirectly from the proposed buyer Trendy Reach Holdings Limited (the "Buyer").[1]

The actual Membership Interest Purchase Agreement ("MIPA") (attached as Ex. B) had 2 attachments attached thereto (both denominated as Schedule 1), which specifically described the "Indirect Ownership in Capital Truth Holdings Ltd. SAC-1 as:

| Entity | Indirect Ownership |
|---|---|
| Fortune Pre-IPO Offshore Fund Class NNN | 733,415 |
| Fortune Pre-IPO Offshore Fund Class TTT | 595,240 |
| Fortune Pre-IPO Offshore Fund Class VVVV | 1,500,000 |
| Fortune Pre-IPO Offshore Fund Class VVVVV | 1,088,530 |

Illustrative Example of Carried Interest Contingencies*
Original Investment & Pre 5-for-1 Stock Split (May 22, 2026)

| Share Class | Subscription Amount | Pre-Split Share Price | Pre-Split Shares | Post-Split Shares | Carry | 9/30/25 NAV | 9/30 Share Price | Carry Adjusted Shares |
|---|---|---|---|---|---|---|---|---|
| Share NNN | $4,913,970 | $335.00 | 14,669 | 146,686 | 20% | $22,386,218 | $212.00 | 105,595 |
| Share TTT | $5,000,000 | $420.00 | 11,905 | 119,048 | 20% | $20,288,761 | $212.00 | 95,702 |
| Share VVVV | $15,450,000 | $515.00 | 30,000 | 300,000 | 20% | $51,425,117 | $212.00 | 242,571 |
| Share VVVVV | $12,300,375 | $565.00 | 21,771 | 217,706 | 20% | $40,639,878 | $212.00 | 191,698 |
| TOTAL | $37,664,345 | | 78,345 | 783,439 | | $134,739,974 | | 635,566 |

*For the avoidance of doubt, it is expected that the pre-carried interest or like charges before deductions represent approximately 783,000 shares (3,915,000, post 5-for-1 split), which will be reduced due to the related carried interest and like charges, which will reduce the delivered shares to approximately 635,000 shares (3,175,000 post 5-for-1 split).

The filling of the 8K (Ex. K) by Triller was outside of Defendants' control. The filed 8K omitted the Schedules which were part of the MIPA.

---

[1] The responding Defendants rely on the Declaration of NG Wing Fai submitted under 28 USC 1746, attached hereto as Exhibit A.

G USRAE  K APLAN  N USBAUM  PLLC

The Honorable Kiyo A. Matsumoto
United States District Judge for the Eastern District of New York
July 27, 2026
Page 3 of 6

The underlying shares held by each of Fortune Pre-IPO Funds are not accessible as per their terms, for 12 months after SpaceX went public. This brings the potential receipt of the underlying shares from the various Fortune Funds to June 2027. (See Ex. C)

The Declaration of Ravindra Pumagame (the "RP Declaration"), (document 115-1 filed 7/17/26 was of concern to the Court and accordingly we address same. (A copy of the RP Declaration is attached as Exhibit D and the attached thereto Exhibit B is attached hereto as Exhibit E).

The Exhibit Notice provided:

IMPORTANT NEWS

SPACEX
Space Exploration Technologies

Dear Investors,

Late Stage Funds has received notice that, as of June 25, 2026, approximately 70-80% of the Fund's SpaceX position has been liquidated.

The proceeds from the transaction are expected to be received over the next several weeks. As proceeds are received by the Fund, distributions will be made to investors as promptly as practicable.

Although the investment was originally subject to a twelve-month holding restriction, this partial liquidation has occurred prior to the expiration of that period.

We will continue to keep investors informed as additional proceeds are received and distributed.

Thank you for your continued confidence in Late Stage Funds.

The document states that "the proceeds from the transactions are expected to be received over the next several weeks." This is the proposed sale to Trendy Reach which has been at issue.

Attached hereto as Exhibit F is an email from Late Stage to Mr. Pumagame, which was sent on July 9, 2026 – subsequent to the July 1, 2026 email (Ex. E) from Late Stage – informing Mr. Pumagame subsequent to the RP Declaration "No Funding of SpaceX has occurred and monies will be disbursed when appropriate."

GUSRAE KAPLAN NUSBAUM PLLC

The Honorable Kiyo A. Matsumoto
United States District Judge for the Eastern District of New York
July 27, 2026
Page 4 of 6

Mr. Pumagame omitted Exhibit F from his Declaration to the Court. Clearly, Mr. Pumagame has been less than candid with the Court.

The Court suggested during our last appearance that Late Stage could have better communicated with its members. In fact, Late Stage did communicate on July 9, 2026 that no funding of the SpaceX sale had occurred and that proceeds would be disbursed "when appropriate".[2]

**Capital Truth Holdings Ltd.**

Capital Truth Holdings Ltd. is a Bahamian entity that was formed in the Bahamas on April 17, 2020. Attached as Exhibit G is a copy of the Certificate of Incorporation of Capital Truth Holdings Ltd.

Capital Truth Holdings Ltd SAC-1 is a segregated account company of Bahamian entity CTH Ltd., that is wholly owned by CTH Ltd.

A Bahamian SAC is a **Segregated Accounts Company**; a single legal entity that can create separate internal accounts whose assets and liabilities are statutorily ring-fenced from one another and from the company's general account. In the Bahamas, the structure is governed by the Segregated Accounts Companies Act, 2004.

The SAC-1 is a segregated account and is treated as economically separate for creditor and asset-protection purposes. Accordingly, one account's liabilities generally cannot reach the assets of another segregated account.

The SAC-1 SpaceX segregated account was established in order to insulate the SpaceX membership interests and to allow for the SAC-1 sale transactions to proceed in an orderly way.

As will be more fully described below, this SAC-1 structure would allow for the sale of the SpaceX interests without outside authorization to effectuate the sale of the interests set forth in the MIPA (Ex. B).

Capital Truth Holdings Limited is an entity that bought and sold pre-IPO securities for its account and risk since its inception.

Capital Truth has sold pre-IPO interests to many institutions, including Late Stage. All transfers and liquidations of the pre-IPO shares sourced by CTH Ltd must be done through CTH Ltd.

---

[2] Submitted relying on the Declaration of Marcello Follano as a Manager of Late Stage as to the Exhibits reliability.

GUSRAE KAPLAN NUSBAUM PLLC

The Honorable Kiyo A. Matsumoto
United States District Judge for the Eastern District of New York
July 27, 2026
Page 5 of 6

From 2020, the pre-IPO market worked as a private market where buyers bought shares in companies before they listed and traded publicly, usually through primary rounds or secondary purchases from employees, founders, early investors, or funds. The main appeal was access to fast-growing companies at private valuations, but the tradeoff was limited transparency, illiquidity, and long holding periods before any exit.

Buys and sells of pre-IPO securities generally happened through specialized private sources or restricted platforms that matched buyers and sellers and handled the legal transfer process.

Part of the investor activity in pre-IPO shares was due to a shift by issuers to seek private capital, and wait longer to actually do an Initial Public Offering ("IPO").

Many of the pre-IPO or rights to pre-IPO shares were secondary sales, meaning buyers bought existing shares or rights to those shares rather than putting new money directly into the pre-IPO company.

As a result of the opaque pricing that existed in the pre-IPO market, pricing was negotiated rather the exchange market determined (e.g., New York Stock Exchange; NASDAQ) and valuation within depended on speculative and perception of valuations based on limited data relating to the pre-IPO issuer, recent private financing rounds and what restricted buyers and sellers could agree on.

Pre-IPO restricted purchases were often derived from derivative securities because derivatives were a practical way to lock in exposure to a private company without immediately transferring the underlying common stock. In private-company settings, common shares were frequently subject to transfer limits, company consent, and ROFR-style restrictions, while options, warrants, convertible instruments, or forward-style contracts could be structured around those constraints.

Many issuers did not cooperate or blocked transfers of pre-IPO shares.

Derivatives were used to document these restrictions and to enable exposure without immediate share transfer, which helped when resale was blocked or difficult and allowed for bundling by the pre-IPO source.

Most importantly, holders of these pre-IPO shares or rights to shares could monetize their ownership, even though there was no public market to so do.

Pre-IPO sellers mostly did not hold simple, freely transferable common stock; they held options, warrants, forward contracts or instruments that converted into equity at a later date. Pre-IPO results often imposed transfer restrictions on common shares, so parties used structures that

GUSRAE KAPLAN NUSBAUM PLLC

The Honorable Kiyo A. Matsumoto
United States District Judge for the Eastern District of New York
July 27, 2026
Page 6 of 6

delivered economic exposure first and physical share ownership later, if approvals and liquidity events aligned.

From an uninformed view, a pre-IPO fund investment may resemble a stock trade even when the legal form is a note, warrant, forward, or fund interest.

Many times, the purchase of a pre-IPO share interest is achieved by the purchase of other funds membership interests. This indirect purchase results in multiple instances of carried interest payments and management fees. As per the MIPA Schedule, discussed above, Exhibit C hereto, all of the underlying membership interests were interests in various Fortune pre-IPO Offshore Funds. All of the Fortune pre-IPO funds were managed by Gigafund.

Contrary to the presentation by the Plaintiffs, and in response to the Court's concerns for who Gigafund and the Fortune pre-IPO funds, we submit herewith an internet generated confirmation of the registration of the Fortune pre-IPO Offshore Fund, Ltd. with the British Virgin Islands Financial Services Commission as a Professional Funds entity, as Ex. H. We also attach Ex. G, the internet printout of who the Gigafund is.

Clearly the entities issuing the membership interests, which are the subject of the MIPA sale are all established and reputable institutions.

The SAC-1 entity was created to do the transactions and no purchase or sale has closed relating to the SAC-1 interests (see Ex. A and Ex. C).

**Other SpaceX Transactions**

Attached hereto as Ex. J is a spreadsheet, starting in 2020, which describes the various SpaceX interest purchases purchased by CTH Ltd, some of which have been redeemed by the funds that issued them. These redemptions, which were under the control of the various issuing Funds, resulted in CTH Ltd. transferring funds where required to Late Stage.

All documents included herewith are included in Declarations by the undersigned and Joshua Cilano, as custodian of the records.

Our time has been limited in having sufficient time to fully respond to all the inaccurate innuendos by the Plaintiffs.

Should the Court have any further questions or issues we are prepared to respond.

Respectfully submitted,

*/s/ Martin H. Kaplan*
Martin H. Kaplan