# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARMAND EVANGELISTA, individually and On behalf of all others similarly situated,<br><br>Plaintiff;<br><br>-against-<br><br>LATE STAGE ASSET MANAGEMENT, LLC, PRIOR 2 IPO INC., CAPITAL TRUTH HOLDINGS LLC, CAPITAL TRUTH ADVISORS, LLC, PRE-IPO MARKETING INC., JL RIVERA ENTERPRISES LTD., VALEO CAPITAL CORPORATION, VERO ENTERPRISE HOLDINGS LLC, EARTH TO ENERGY, INC., AMERICAN BIOCARBON, LLC, GREEN LIFE FARMS, INC., CS SOLUTIONS, INC., RAYMOND J. PIRRELLO, JR., MARCELLO FOLLANO, JOSHUA CILANO, ANTHONY DITUCCI, JOSEPH RIVERA, JOSEPH PASSALAQUA and JEAN HALLE,<br><br>Defendants | Case No. 24-cv-05292-KAM-MMH |

**DECLARATION OF NG WING FAI**

Pursuant to 28 U.S.C. § 1746, I, Ng Wing Fai, depose and say as follows:

1.    I am over eighteen years of age and am competent to make this Declaration.

2.    I submit this Declaration based upon my personal knowledge of the transaction described in the Current Report on Form 8-K filed by Triller Group Inc. ("**Triller**") with the U.S. Securities and Exchange Commission on June 25, 2026 (the "**8-K**"), reporting Trendy Reach Holdings Limited's entry into a Membership Interest

1

Purchase Agreement, dated June 23, 2026 (the "**Purchase Agreement**"), with Capital Truth Holdings Ltd. and Capital Truth Holdings, Ltd. SAC1, for the purchase of 100% of the membership interests in Capital Truth Holdings, Ltd. SAC1, an entity that indirectly holds 3,917,185 shares of Class A common stock of Space Exploration Technologies Corp. ("**SpaceX**") through its interest in the Fortune Pre-IPO Offshore Fund Ltd. – Gigafund vehicles (the "**Transaction**"). A true and correct copy of the 8-K, including the Purchase Agreement and press release furnished as exhibits thereto, is attached hereto as Exhibit A.

3.    I am the Group Chief Executive Officer and a Director of Triller Group Inc. ("**Triller**"). Triller is the sole member and direct parent of Trendy Reach Holdings Limited, a wholly owned British Virgin Islands subsidiary of Triller. Under the Purchase Agreement, Triller executed in the capacity of "Buyer Manager" for Trendy Reach, and I signed the Purchase Agreement on Triller's behalf in that capacity.

4.    I am also the Chief Executive Officer of Trendy Reach Holdings Limited ("**Trendy Reach**"), Triller's wholly owned subsidiary and the "Buyer" under the Purchase Agreement, and I signed the Purchase Agreement on Trendy Reach's behalf in that capacity.

5.    I have served as Group Chief Executive Officer, Chairman of the board, and an executive director of the board of AGBA (Triller's predecessor entity) since November 2022. Prior to joining AGBA, I was the Managing Partner and a Founding Partner of Primus Pacific Partners, an Asian private equity fund focused on financial services. I have also served as Managing Director of Fubon Financial Holding, the largest financial

conglomerate in Taiwan, where I oversaw its overall strategy, capital markets, and merger and acquisition activities, and as Managing Director and Head of the Asia-Pacific Financial Institutions Group at Salomon Smith Barney. I am a graduate of the University of Cambridge and received a master's degree in business administration from Harvard University in 1994.

6.      I have requested an extension of 30 days beyond the Outside Closing Date set forth in the Purchase Agreement so that Trendy Reach can continue in its pursuit of the underlying funding necessary to complete the Transaction.

7.      The funding for the Transaction has been delayed as a result of the outbreak of armed conflict involving Iran. The funding for the Transaction was expected to be provided, in whole or in part, by lenders or investors based in Abu Dhabi and Singapore, and the regional instability in the Middle East caused by that conflict disrupted and delayed the finalization and delivery of that funding, necessitating the extension described above.

8.      The extension has been granted, and as such Trendy Reach now has until August 26, 2026 to consummate the Transaction.

9.      No funds or other consideration has been delivered to Capital Truth Holdings Ltd. or Capital Truth Holdings, Ltd. SAC1 or anyone else including any escrow agent relating to the Transaction.

10.      No membership interests or any shares or rights to anything have been transferred pursuant to the Membership Interest Purchase Agreement or otherwise related to the Transaction.

3

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 26, 2026
     Doha, Qatar

_____

Ng Wing Fai

4

# EXHIBIT A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**Form 8-K**

**Current Report**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

**June 23, 2026**
Date of Report (Date of earliest event reported)

**TRILLER GROUP INC.**
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 001-38909 | 33-1473901 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 1301 N Broadway, STE 98065, Los Angeles, CA | 90012 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: **(947) 622-9043**

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.001 par value | ILLR | NASDAQ Capital Market |
| Warrants, each warrant exercisable for one-quarter of one share of Common Stock for $23.00 per full share | ILLRW | NASDAQ Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01 Entry into a Material Definitive Agreement**

On June 23, 2026, Trendy Reach Holdings Limited ("Buyer"), a wholly owned British Virgin Islands subsidiary of Triller Group Inc. ("Triller"), entered into a definitive membership interest purchase agreement (the "Purchase Agreement") with a limited liability company organized under the laws of The Bahamas ("Seller"), for Buyer to purchase 100% of the membership interests (the "Holdings Membership Interests") of SAC1, a Bahamian investment vehicle ("Holdings") that owns certain common stock equivalent interests (the "Share Equivalents"), through the Holdings investment in the Fortune Offshore Fund – Gigafund in and to 3,917,185 shares of Class A common stock, par value $0.001 per share (the "SpaceX Shares") of Space Exploration Technologies Corp., a Texas corporation ("SpaceX").

The purchase price for the Holdings Membership Interests is US $411,304,425 (the "Purchase Price"), which is the equivalent of $105 per Share Equivalent.

The closing of the purchase of the Holdings Membership Interests will no later than July 22, 2026 (the "Outside Closing Date"). The actual date of the closing is referred to as the "Closing Date." The Purchase Price will be held in escrow pending the closing, and will be released when irrevocable instructions and related documentation for the transfer of the SpaceX Shares and/or the Share Equivalents to the Buyer have been finalized by all parties.

The Purchase Agreement contains standard representations and warranties by both parties, as well as additional representations by the Seller as to the Holdings Membership Interests, the Share Equivalents and the SpaceX Shares. The Purchase Agreement also contains a number of closing conditions, including without limitation (i) the closing having occurred on or before the Outside Closing Date, (ii) the funding of the escrow account in the full amount of the Purchase Price; and (iii) the completion of due diligence by the Buyer to the satisfaction of the Buyer in its sole discretion.

The Holdings Membership Interests will be transferred to the Buyer in a transaction pursuant to an applicable exemption from the registration requirements of the Securities Act of 1933, as amended, (the "Securities Act") including without limitation a private resale pursuant to so called "Section 4(a)(1½)". The Holdings Membership Interests, the Share Equivalents and the SpaceX Shares have not been registered under the Securities Act and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

**Item 7.01 Regulation FD Disclosure.**

On June 25, 2026, the Company issued a press release announcing the transaction described in this Current Report. A copy of the press release is furnished as Exhibit 99.1 hereto.

The information in this Item 7.01, including Exhibit 99.1, is being furnished and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that Section, nor shall it be deemed incorporated by reference into any filing under the Securities Act or the Exchange Act, except as expressly set forth by specific reference in such a filing.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Exhibit |
|---|---|
| 10.1 | Membership Interest Purchase Agreement, by and between the Triller Group Inc., Trendy Reach Holdings Limited., dated as of June 23, 2026 |
| 99.1 | Press Release dated June 25, 2026 |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

2

**SIGNATURE**

Pursuant to the requirements of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**TRILLER GROUP INC.**

By: **/s/ Shu Pei Huang, Desmond**

Name:   Shu Pei Huang, Desmond
Title:    Acting Chief Financial Officer

Dated: June 25, 2026

3

Exhibit 10.1

23 JUNE 2026

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement"), is made effective and entered into as of June 23, 2026 (this "Execution Date"), by and among **Capital Truth Holdings Ltd**. ("Seller"), a limited liability company organized under the laws of The Bahamas, and has its principal place of business in The Bahamas and is represented herein by its Managing Member (the "Company Managing Member"), **Capital Truth Holdings, Ltd. SAC1** (the "Company"), an investment vehicle that is incorporated in The Bahamas and has its principal place of business in The Bahamas and **Trendy Reach Holdings Limited** (the "Buyer"), a limited liability company organized under the laws of British Virgin Islands, and has its principal place of business in Hong Kong S.A.R and is represented by **Triller Group Inc.** (the "Buyer Manager"). Seller, the Company, Buyer, and the Buyer Manager are sometimes referred to herein as a "Party," and collectively, the "Parties."

### RECITALS

**WHEREAS**, Seller owns all of the outstanding membership interests of the Company (the "Aggregate Membership Interests");

**WHEREAS**, the Company owns certain class interests (the "FOF Interests") in Fortune Pre-IPO Offshore Fund Ltd, Gigafund managed vehicles (the "Fortune Offshore Fund");

**WHEREAS**, the FOF Interests represent the Company's indirect ownership of 3,917,185 common stock equivalents (the "SpaceX Shares") of Space Exploration Technologies Corp. ("SpaceX");

**WHEREAS**, Seller desires to sell to Buyer and Buyer desires to purchase from Seller the Aggregate Membership Interests on the terms and conditions set forth in this Agreement.

### AGREEMENT

**NOW**, **THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby mutually agree to all of the provisions of this Agreement.

**ARTICLE I.**
**PURCHASE AND SALE.**

Section 1.01 <u>Purchase and Sale</u>. At Closing (i) in consideration for the payment at Closing by the Buyer to the Seller of the Purchase Price (as defined below), the Seller shall sell, assign and transfer to the Buyer the Aggregate Membership Interests and all rights of Seller therein, and (ii) Buyer shall pay the Purchase Price to the Seller and purchase the Aggregate Membership Interests and shall succeed to all the rights and obligations relating thereto, including all rights and obligations under the Company Governing Documents and the Fortune Offshore Fund Governing Documents, including all obligations of the Seller, the Company Managing Member and the Company to pay all carried interest participation rights and management fees (all of which obligations succeeded to by the Buyer and the Buyer Manager will be expressly assumed at Closing in the Assignment and Assumption Agreement entered into and effective on the Closing Date). The aggregate purchase price payable by Buyer to Seller at Closing is US $411,304,425 (the "<u>Purchase Price</u>"), which represents the indirect purchase of the 3,917,185 underlying common stock equivalent SpaceX Shares at a price of US $105 per SpaceX Share.

Section 1.02 <u>Delivery Mechanics</u>. The Buyer will deposit the Purchase Price into an escrow account established by the Seller at a ROYAL ESCROW SERVICES, LLC,10549 Summertime Lane, Royal Palm Beach, FL 33411the "<u>Escrow Account</u>") in accordance with terms set forth in the escrow agreement governing the Escrow Account, (the "<u>Escrow Agreement</u>"). The Purchase Price will be automatically released to the Seller simultaneously when irrevocable instructions that evidence the Buyer's (or Buyer's designee's, whether directly or through Buyer's 100% ownership of the Company) full right to receive the Aggregate Membership Interests, the FOF Interests and the SpaceX Shares have been executed and delivered by the Seller, the Company, and the Fortune Offshore Fund (such documents are referred to collectively as the "<u>Transfer Documents</u>").

Section 1.03 <u>Closing</u>. The purchase by the Buyer from the Seller of the Aggregate Membership Interests for the Purchase Price (the "<u>Closing</u>") shall take place no later than 30 days after the Execution Date (the "Outside Closing Date"), pursuant to the electronic exchange of all executed documents and other Closing deliverables required hereunder (the date of the Closing, the "<u>Closing Date</u>").

Section 1.04 <u>Purchase Price and Mechanics at Closing</u>. Prior to the Closing Date, the Buyer shall wire transfer the Purchase Price to the Escrow Account.

Section 1.05 <u>Closing Deliverables</u>.

(a) <u>Seller Deliveries</u>. At Closing, Seller shall deliver to Buyer:

(i) a mutually agreed upon assignment and assumption agreement in the form of Exhibit A attached hereto (the "<u>Assignment and Assumption Agreement</u>"), duly executed by the Company Managing Member;

(ii) all Transfer Documents, duly executed by all appropriate parties;

(iii) an agreed upon General Release, duly executed by the Seller, which will be released immediately after title to the SpaceX Shares has passed to the Buyer or its designee;

(iv) All fully executed third party consents required to pass title to the SpaceX Shares to the Buyer, and any amendments to any Governing Documents required to pass title to the SpaceX Shares to Buyer; and

(v) general administrative access credentials to the carta.com platform and any other equity management, capitalization table, or fund administration software currently used to administer, record, or track the ownership, capitalization, membership interests and/or underlying investments of the Company in and/or relating to the FOF Interests.

2

(b) <u>Buyer and Buyer Manager Deliveries</u>. At the Closing, Buyer shall deliver to the Seller:

    (i)   an email authorizing the Seller to transfer the Purchase Price from the Escrow Account to the Seller by wire transfer to an account of the Seller;

    (ii)   the Assignment and Assumption Agreement, duly executed by or on behalf of Buyer and Buyer Manager; and

    (iii) the General Release duly executed by the Buyer, which will be released immediately after title to the SpaceX Shares has passed to the Buyer or its designee.

Section 1.06 <u>The Seller Manager</u>. At the time of Closing, the Company Managing Member shall assign to the Buyer Manager all of the Company Managing Member's rights and obligations as the managing member of the Company in consideration for $1.00 payable by Buyer to Seller (the "<u>Management Assignment</u>"). In connection and simultaneous with the Management Assignment, the Buyer Manager shall assume all post closing liabilities, fees, expenses and obligations of the Company Managing Member, including those set forth in the Management Agreement, dated as of [*], by and between the Company and the Company Managing Member (the "<u>Assumed Management Liabilities</u>").

Section 1.07 <u>Assignment and Assumption Agreement</u>. The Assignment and Assumption Agreement will provide that effective as of the Closing, Seller hereby conveys, assigns and transfers to Buyer, and Buyer hereby assumes, all right, title and interest (A) of Seller in, to the Aggregate Membership Interests sold by Seller to Buyer at the Closing, (B) of Seller in, to and under the Company Governing Documents, (C) of Seller in, to and under the FOF Interests indirectly acquired by Buyer from Seller at Closing, (D) of Seller in, to and under the Fortune Offshore Governing Documents and the FOF Interests, and (E) other documents relating to that portion of the Aggregate Membership Interests and the FOF Interests sold directly and indirectly, as applicable, by Seller to Buyer at Closing (the "<u>Transfer</u>").

Section 1.08 <u>Certain Obligations Assumed by Buyer and Buyer Manager at Closing</u>. For clarity purposes and avoidance of doubt, notwithstanding anything to the contrary provided in this Agreement or elsewhere, at Closing, Buyer and Buyer Manager shall pursuant to this <u>Section 1.08</u>, assume all liabilities and obligations of the Seller, the Company Managing Member and the Company for 2026 and thereafter to pay all carried interests participation rights and management fees relating directly and/or indirectly relating to the FOF Interests, the Aggregate Membership Interests and the SpaceX Shares, whether set forth in the Company Governing Documents, the Fortune Offshore Governing Documents and/or otherwise.

**ARTICLE II.**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER AND THE COMPANY**

Each of Seller and the Company, jointly and severally, hereby represents and warrants to Buyer as set forth in this Article II:

Section 2.01 <u>Organization</u>. Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the Bahamas. The Company is [an investment vehicle], duly organized, validly existing and in good standing under the laws of the Bahamas. Each of Seller and the Company has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby.

Section 2.02 <u>Authority</u>. The execution and delivery by such party of this Agreement, and the performance by such party of its obligations hereunder have been duly and validly authorized by all necessary actions on the part of such Party. This Agreement has been duly and validly executed and delivered by such party constitutes the legal, valid and binding obligation of such party, enforceable against it in accordance with its terms subject, as to enforcement, to the bankruptcy, reorganization, insolvency and other similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

Section 2.03 <u>Ownership</u>.

(a) Except for this Agreement, Seller has not granted any options, warrants, or rights to subscribe to, securities, rights or obligations convertible into or exchangeable for or giving any right to subscribe for all or any portion of the Aggregate Membership Interests, which represents all of the issued and outstanding membership interest of the Company. At the Closing, upon consummation of the transactions contemplated hereby, Buyer shall acquire from the Seller the Aggregate Membership Interests. No other Persons owns or has any rights to own any membership interests in the Company or to the FOF Interests.

(b) Neither the Company nor the Seller has granted to any third party any options, warrants, or rights to subscribe to, securities, rights or obligations convertible into or exchangeable for or giving any right to subscribe for all or any portion of the FOF Interests. At the Closing, upon consummation of the transactions contemplated hereby, the Company's ownership and all other rights to the FOF Interests shall be identical to the Company's ownership and all other rights to the FOF Interests as of the date hereof.

(c) The Company does not own any assets other than the FOF Interests, and does not have any liabilities or obligations to any other party. The Company is not a party to any legally binding agreement other than the Company Governing Documents and the Fortune Offshore Fund Documents, and none of such documents creates any obligation on the part of the Company to any third party. Without limiting the generality of the foregoing, there are no written or verbal agreements between the Company and the Seller or between the Company and any affiliate of the Seller.

(d) The FOF Interests grant to the holder thereof the full right to take title to the SpaceX Shares, at the time and in the discretion of the owner of the FOF Interests.

Section 2.04 <u>Lock-Ups or Other Liens</u>. Except as described on <u>Schedule 2.04</u> hereto, There is no mortgage, pledge, security interest, attachment, right of first refusal, option, proxy, voting trust, encumbrance, lock-up agreement (the "Lock-Up Agreements"), lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), restriction (on voting, sale, transfer, disposition), any subordination arrangement in favor of another Person, or any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar Law, on or affecting any of (a) the Aggregate Membership Interests, (b) the FOF Interests or (c) the SpaceX Shares. The SpaceX Shares may be freely transferred, sold, hypothecated, pledged, used as security in any manner, subject only to applicable restrictions set forth in the Lock-Up Agreements or under the U.S. securities laws. Seller has delivered to Buyer true copies of all Lock-Up Agreements.

Section 2.05 <u>No Consents</u>. No consent, approval or other action is required to be taken by the Seller, the Company, the Fortune Offshore Fund, SpaceX, Gigafund Management Company, LLC, any governmental entity, or any other Person in order for the parties to this Agreement to execute this Agreement and/or to consummate the transactions contemplated hereby.

Section 2.06 <u>Indirect Ownership of SpaceX Shares; Control</u>. The Company's ownership of the FOF Interests represents the Company's sole and entire indirect ownership interest in the SpaceX Shares and such indirect ownership is held through the Fortune Offshore Fund, which in turn holds its indirect SpaceX exposure through investment vehicles managed by Gigafund Management Company, LLC, in each case in accordance with their respective governing documents. The FOF Interests do not give the holder thereof any rights or obligations that do not relate directly to the SpaceX Shares.

Section 2.07 <u>No Other Representations and Warranties</u>. Seller acknowledges, agrees, represents and warrants that other than the express representations and warranties by Buyer set forth in Article III, neither Buyer, the Company nor the Company Managing Member has directly or indirectly made any representations or warranties to the Seller or the Seller Manager.

**ARTICLE III.**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to the Seller as set forth in this Article III:

Section 3.01 <u>Organization</u>. Buyer is a limited liability company validly existing and in good standing under the laws of the jurisdiction in which it was formed and has the power and authority and all necessary governmental approvals to operate and carry on its business as it is now being conducted or presently proposed to be conducted.

Section 3.02 <u>Authorization</u>. Buyer and Buyer Manager have full power and authority to execute and deliver this Agreement and purchase the Aggregate Membership Interests and indirectly acquire the FOF Interests. Buyer's purchase of the Aggregate Membership Interests (and the FOF Interests owned by the Company), and its and the Buyer Manager's assumption of all obligations and liabilities of the Seller, the Company Managing Member and the Company under <u>Section 1.08</u> hereof, the Governing Documents, the Management Agreement and the Assignment and Assumption Agreement and their execution and delivery of this Agreement and the other agreements and documents contemplated hereby have been authorized by all necessary action on Buyer's behalf, and no consent, approval or authorization is required for the performance by Buyer of its obligation hereunder and thereunder, except as set forth herein. This Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (b) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

Section 3.03 <u>Validity</u>. The execution and delivery of this Agreement, the consummation of the transactions contemplated herein and the performance of Buyer's obligations hereunder shall not conflict with, or result in any violation of or default under, any provision of any governing instrument applicable to Buyer, or any agreement or instrument to which Buyer is a party or by which Buyer or any of its properties is bound, or any permit, franchise, judgment, ongoing or completed legal proceedings (including bankruptcy), decree, statute, rule or regulation applicable to Buyer or its business or properties.

Section 3.04 <u>Information; No Reliance</u>. Buyer is a sophisticated, experienced investor, capable of evaluating the value of the Aggregate Membership Interests and the Fortune Offshore Fund Interests, and has conducted its own due diligence analysis in its decision to purchase the Aggregate Membership Interests and to indirectly acquire the Fortune Offshore Fund Interests pursuant to this Agreement. Buyer believes it has received all the information it considers necessary or appropriate for deciding whether to enter into this Agreement and perform its obligations set forth herein. Buyer hereby acknowledges that neither the Seller, the Company nor the Company Managing Member have made any representations regarding the business, management, financial affairs or prospects of the Seller, the Company, the Aggregate Membership Interests, the Fortune Offshore Fund Interests and/or the SpaceX Shares, nor has Buyer relied on any representation or statement of Seller, the Company or the Company Managing Member or any of their affiliates, representatives, agents and/or advisors, other than those expressly set forth in this Agreement, in making Buyer's investment decision to purchase the Aggregate Membership Interests and the FOF Interests.

Section 3.05 <u>No Other Representations and Warranties</u>. Buyer acknowledges, agrees, represents and warrants that other than the express representations and warranties by Seller and the Company set forth in Article III, neither Seller, the Company nor the Company Managing Member has directly or indirectly made any representations or warranties to the Buyer or the Buyer Manager.

**ARTICLE IV.**
**CLOSING CONDITIONS**

Section 4.01 <u>Conditions to Obligations of Buyer</u>. The obligations of Buyer under this Agreement with respect to the Closing are subject to the satisfaction at or prior to the Closing of the following conditions:

(a) <u>Representations and Warranties</u>. The representations and warranties of Seller and the Company set forth herein shall be true and correct on and as of the Closing Date.

(b) <u>Performance</u>. Seller shall have performed and complied with all agreements, obligations, and conditions set forth in this Agreement that are required to be performed or complied with by such Seller on or before the Closing.

6

(c) <u>Diligence by Seller</u>. Seller shall, no later than two Business Days after the Effective Date, provide Buyer with true and correct copies of all Governing Documents and all Lock-Up Agreements; and Buyer shall have completed all diligence of said documents and all other documents reasonably deemed by it to be material to this transaction, to the satisfaction of the Buyer in its sole discretion.

(d) <u>Documentation</u>. The parties shall have mutually agreed on the form and substance of all documents relating to this transaction, including without limitation the Escrow Agreement, Transfer Documents, the Assignment and Assumption Agreement and the General Releases referred to herein. As of the Closing, any Transfer Documents that are required in order to provide the Company and/or the Buyer with all right and power to demand and receive the SpaceX Shares from the Fortune Offshore Fund in exchange for the FOF Interests shall have been fully executed.

(e) <u>Escrow Account</u>. The Escrow Account shall have been funded in an amount equal to no less than the Purchase Price.

(f) <u>Consents</u>. Any third party consents required to consummate the transactions contemplated by this Agreement (including without limitation from the Company, the Fortune Offshore Fund, SpaceX, Gigafund Management Company, LLC, any governmental entity, or any other Person) shall have been obtained and delivered to the Buyer.

Section 4.02 <u>Conditions to Obligations of the Seller</u>. The obligations of the Seller under this Agreement with respect to the Closing are subject to the satisfaction at or prior to the Closing of the following conditions:

(a) <u>Representations and Warranties</u>. The representations and warranties of the Buyer set forth herein shall be true and correct on and as of the Closing Date.

(b) <u>Performance</u>. Buyer shall have performed and complied in all material respects with all agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing.

Section 4.03 <u>Termination</u>.

(a) <u>Outside Closing Date</u>. If the Closing has not occurred on or before the Outside Closing Date, (i) either the Buyer or Seller may terminate this Agreement and all obligations and rights of the Parties hereto by a written notice to the other (a "<u>Termination Notice</u>"), or (ii) the Buyer and Seller may extend the Closing Date one or more times by a mutual writing to such date as the Parties so agree therein .

(b) <u>Effect of Termination</u>. Upon delivery of a valid Termination Notice, this Agreement and all rights and obligations of the parties hereto shall terminate and be of no further force or effect without any liability to any Party., except that if any or all of the Purchase Price has been previously wired to the Escrow Account, Seller shall promptly return such funds to the Buyer.

**ARTICLE V.**
**GENERAL PROVISIONS**

Section 5.01 <u>Notices</u>. All notices, requests and other communications hereunder must be in writing and shall be deemed to have been duly given only if delivered personally or by email transmission or mailed (first class postage prepaid) to the parties at the following addresses or facsimile numbers:

If to the Company (prior to Closing) or the Seller:

Capital Truth Holdings Ltd.
Attention: Operations
Email: Operations@CapitalTruthHoldings.com

with a copy to: Global Corporate Management Ltd.

Rosetta House
21 Rosetta Street
PO Box SS-5212
Nassau Bahamas
Attention: Jerome Gomez
Email: Jpgomez@globalcmltd.-com

If to Buyer or the Buyer Manager or, following Closing, the Company:
Trendy Reach Holdings Limited
20F Foyer, 625 King's Road, North Point, Hong Kong S.A.R.
Attention: Triller Group Inc.
Email: almond.wong@agba.com

with a copy to:

Loeb & Loeb LLP
345 Park Ave, New York, NY 10154
Attn: Lawrence Venick
Telephone No: (310) 728-5129
Email: lvenick@loeb.com

Triller Group Inc.
1301 N Broadway, STE 98065, Los Angeles, CA 90012
Attention: Ng Wing Fai
Email: wfn@agba.com

All such notices, requests and other communications shall (i) if delivered personally to the address as provided in this Section 5.01, be deemed given upon delivery, (ii) if delivered by email transmission to the facsimile number as provided in this Section 5.01, be deemed given upon receipt, and (iii) if delivered by mail in the manner described above to the address as provided in this Section 5.01, be deemed given upon sending (in each case regardless of whether such notice, request or other communication is received by any other Person to whom a copy of such notice is to be delivered pursuant to this <u>Section 5.01</u>). Any Party from time to time may change its address, facsimile number or other information for the purpose of notices to that Party by giving notice specifying such change to the other Party.

Section 5.02 <u>Waiver</u>. Any term or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the Party waiving such term or condition. No waiver by any Party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by law or otherwise afforded, shall be cumulative and not alternative.

Section 5.03 <u>Amendment</u>. This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each Party.

Section 5.04 <u>Assignment</u>. Neither Party may assign this Agreement or any of its rights or obligations hereunder to any third party without the express written consent of the other Party.

Section 5.05 <u>Binding Effect</u>. This Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective permitted successors and assigns.

Section 5.06 <u>Headings</u>. The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

Section 5.07 <u>Rules of Construction</u>. References herein to Schedules, Exhibits, and other attachments shall be to the particular Schedule, Exhibit, or attachment attached hereto, all of which are incorporated herein by reference. References herein to Sections and Articles shall be to the particular Section or Article hereof and to no other document. All dollar amounts set forth herein are in United States dollars.

Section 5.08 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with laws of The Bahamas.

Section 5.09 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and this Agreement may be executed by facsimile, digital scan, or online means for signing digitally stored documents.

Section 5.10 <u>Certain Definitions</u>. Capitalized terms used but not defined herein shall have the following meanings:

"<u>Business Day</u>" means any day other than a Saturday, Sunday, or a day on which commercial banks in Nassau, The Bahamas, are authorized or required by applicable law to be closed.

"<u>Company Governing Documents</u>" means all documents pertaining to the governance of the Company (these may be specified in a mutually agreed upon exhibit at a later date).

"<u>Fortune Offshore Fund Governing Documents</u>" means all documents pertaining to the formation and governance of the Fortune Offshore Fund (these may be specified in a mutually agreed upon exhibit at a later date but should include the relevant LPA's and PPM's); and will include, without limitation, all documents pertaining to the right of the Company to request, demand and/or receive SpaceX Shares that are currently represented by the FOF Interests.

"<u>Governing Documents</u>" means the Company Governing Documents and the Fortune Offshore Fund Governing Documents.

***<u>Signature page follows</u>***

9

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized person of each party hereto as of the date first above written.

**BUYER: Trendy Reach Holdings Limited**

By:  /s/ Ng Wing Fai
      Name:    Ng Wing Fai
      Title:    Chief Executive Officer

**BUYER MANAGER:**

By:  /s/ Ng Wing Fai
      Name:    Ng Wing Fai
      Title:    Chief Executive Officer and Director

**SELLER: Capital Truth Holdings Limited**
a Commonwealth of the Bahamas limited liability company

By:  _____
      Authorized Signatory

**THE COMPANY: Capital Truth Holdings Ltd. SAC1**

By:  _____
      Authorized Signatory

**COMPANY MANAGING MEMBER:**

By:  _____
      Name:
      Title:

10

Exhibit 99.1

**Triller Group (Nasdaq: ILLR) to Acquire Significant SpaceX Position as a Strategic Treasury Asset**

*Transaction places SpaceX exposure directly on the Company's balance sheet as a strategic treasury holding*

**LOS ANGELES, June 25, 2026 (GLOBE NEWSWIRE) --** Triller Group Inc (Nasdaq: ILLR; ILLRW) ("Triller" or the "Company") today announced that it has entered into definitive agreements to acquire a significant position providing economic exposure to SpaceX (Nasdaq: SPCX), to be held as a strategic treasury asset on the Company's balance sheet.

The Company is acquiring the position — held through an established fund structure — through a wholly-owned special-purpose subsidiary, financed through a secured financing arrangement. The position was established well ahead of SpaceX's public listing and is being acquired at a meaningful discount to its current market value.

"This is a transformational step for our Company," said Wing-Fai Ng, Group Chief Executive Officer. "SpaceX is one of the most extraordinary companies of our generation, and we are securing meaningful exposure to it at a compelling entry point and placing it at the very heart of our balance sheet. We believe this fundamentally changes how investors should look at Triller, and we are proud to give our shareholders a stake in that story."

The transaction establishes a dedicated SpaceX treasury position and positions Triller as one of the only Nasdaq-listed companies with disclosed, balance-sheet SpaceX exposure. The financing is secured by the underlying position, and the Company retains a portion of the position as treasury for the benefit of its shareholders.

The Company expects the transaction to close in the coming days, subject to the satisfaction of customary conditions, and intends to provide further detail in its filings with the U.S. Securities and Exchange Commission ("SEC").

***About Triller Group Inc.***

Triller Group Inc. (Nasdaq: ILLR; ILLRW) is a technology and media company operating Triller App, a social media and live-streaming platform focused on music, sports, fashion and culture, together with AGBA Group, a Hong Kong-based financial-services and platform business with longstanding operations in wealth distribution, healthcare and related services across Asia.

**Safe Harbor Statement**

This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, including statements regarding resumption of trading on Nasdaq, the Company's ability to maintain timely SEC periodic reporting and Nasdaq compliance, the effectiveness of its remediation measures, the anticipated benefits of resumed Nasdaq trading, and the timing of future corporate updates. These statements are based on Triller's current expectations and assumptions and involve risks and uncertainties that could cause actual results to differ materially, including risks relating to the effects of the period of trading suspension and resumption of trading on Nasdaq, market conditions, the Company's ability to execute its monetization and operating plans, the availability of financing, the identification, negotiation or completion of any acquisitions or other strategic transactions, compliance with listing standards and reporting requirements, legal or regulatory proceedings, and the other risks described in Triller's SEC filings. The words "believe," "estimate," "anticipate," "project," "intend," "expect," "plan," "outlook," "scheduled," "forecast" and similar expressions are intended to identify forward-looking statements. The forward-looking statements contained in this press release speak only as of the date of its issuance. Except where required by applicable law, the Company expressly disclaims a duty to provide updates to forward-looking statements after the date of this press release to reflect subsequent events, changed circumstances, changes in expectations, or the estimates and assumptions associated with them.

The forward-looking statements in this press release are intended to be subject to the safe harbor protection provided by the federal securities laws.

###

Contact:

Bethany Lai, Investor Relations and Communications

IR@agba.com